**Rosa Marie RIOS et al., Plaintiffs,**

v.

**Henry P. READ et al., Defendants.**

**No. 75 Civ. 296.**

United States District Court,
E. D. New York.

Oct. 13, 1978.

Puerto Rican Legal Defense & Ed. Fund, Inc., New York City, for plaintiffs; Robert Hermann, Peter Bienstock, Idelisse Malave, New York City, of counsel.

Teitelbaum & Hiller, New York City, for plaintiffs; Herbert Teitelbaum, New York City, of counsel.

Pelletreau & Pelletreau, Patchogue, N. Y., for defendants; Frederic L. Atwood, Vanessa M. Sheehan, Patchogue, N. Y., of counsel.

Memorandum of Decision and Order

MISHLER, Chief Judge.

*THE COMPLAINT*

The individual named plaintiffs who are of Puerto Rican ancestry, bring this action on behalf of their children who attend school in the Patchogue-Medford School District. They claim that their children have English language deficiencies and that they are deprived equal educational opportunity with monolingual English speaking students. Plaintiffs contend that this is a violation of the equal protection of laws guaranteed by the fourteenth amendment to the Constitution of the United States (Complaint par. 24) and Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq. and the regulations promulgated thereunder.[1]

The named plaintiffs bring the action as representatives of a class certified by the order of this court dated February 3, 1976 as

---

1. The complaint also alleges a right under 42 U.S.C. § 1983 in the prayer for relief (Complaint par. 26B).

Puerto Rican and Hispanic children attending school in the Patchogue-Medford School District who are unable to understand the courses taught in the district because of deficiencies in understanding the English language.

*THE ANSWER*

Defendants are school officials and members of the Board of Education of the Patchogue-Medford School District who are charged with the duty of complying with Federal and State statutes and regulations relating to the education of children attending schools in the District. Their answer generally denies the material allegations of the complaint and affirmatively alleges that the District offers a bilingual program that adequately meets the needs of students whose dominant language is Spanish and which fully complies with the constitutional and statutory mandate requiring the same learning opportunity be afforded to Spanish speaking students as their English speaking counterparts. Additionally, the answer alleges affirmative defenses, lack of subject matter jurisdiction and failure to exhaust administrative remedies.[2]

A trial of the issues was to the court without a jury. The court finds:

*The School District.*

The Patchogue-Medford School District is located in Suffolk County on the south shore of Long Island, approximately 60 miles east of New York City. The District has jurisdiction over the public school system in the Village of Patchogue and the Hamlet of Medford. The total population within its territorial jurisdiction is approximately 55,000. Its school population is approximately 11,000 students of whom approximately 800 are Hispanic. The school district operates seven elementary schools (kindergarten to grade 5), three middle schools (grades 6 to 9) and one high school (grades 10 to 12).[3]

*Supervision of the Bilingual Education Program.*

From July 1972 to July 1977 the school district offered a bilingual education program under the leadership of Paul Hauser, the director of Pupil Services.[4] From September 1974 to June 1976, the bilingual education program was under the direct supervision of Dr. Ildefonso Cabrera, a bilingual teacher, as chairman of the bilingual department. In July 1977, Frank John Rossi, succeeded Mr. Hauser as supervisor of the bilingual education program in a newly created post of Director of Instructional Services which included responsibility for the entire bilingual education program of the school district from kindergarten to grade 12.

*Students Enrolled in the Bilingual Program.*

Of the approximate 800 Hispanic children attending school only 186 participate in the bilingual program: they are distributed (as of the fall term, 1977) throughout the school system as follows:

**2.** Other affirmative defenses, *i. e.,* failure to join necessary parties, failure to allege a specific act of discrimination are clearly without merit and will not be discussed.

**3.** The elementary schools are known as Barton Ave., Bay Ave., Canaan, Eagle Drive, Medford Ave., River Ave., and Temont Ave.; the middle schools are known as Oregon Ave., Saxton St., and So. Ocean Ave.; the high school is called Senior High School.

The time of the institution of the bilingual education program and its development is obscure. In 1969 a program was offered by Mrs. Dramine Catullo whose first language is Spanish. Before employment as a Spanish bilingual teacher by the school district in 1969, she taught Spanish, French and English in high school but had neither training nor experience as a bilingual teacher. She recently enrolled in C.W. Post College in its bilingual cultural program leading to "elementary certification." (Trans. pps. 1135–7)

**4.** The bilingual education program was only one of many duties with which Mr. Hauser was charged. He also coordinated various supportive service programs and special needs programs, *e. g.*, attendance procedures, drug counseling programs, guidance counseling service programs, health programs, in-district services by personnel such as nurses, health aids, speech correction services, contract services for handicapped children, etc.

| Elementary Schools | [Grade] K | 1 | 2 | 3 | 4 | 5 | 6 | Bilingual Pupils in Special Ed. [Not Graded] * | Total in Bilingual Program | Total Hispanics in School, Fall 1977 |
|---|---|---|---|---|---|---|---|---|---|---|
| Barton Ave. | 5 | 7 | 3 | 2 | 1 | 1 | | | 19 | 59 |
| Bay Ave. | 1 | 3 | 2 | 5 | 1 | 1 | | 3 | 16 | 48 |
| Canaan | 2** | • | • | • | • | • | | | 2 | 44 |
| Eagle Drive | 2 | 3 | 5 | 2 | 2 | - | 2 | 1 | 17 | 82 |
| Medford Ave. | 2 | 12 | 3 | 8 | 5 | 2 | | | 32 | 67 |
| River Ave. | 6 | 6 | 5 | 6 | 2 | 1 | | | 26 | 81 |
| Tremont Ave. | - | - | • | - | - | • | | | | 67 |
| Total of Grade | 18 | 31 | 18 | 23 | 11 | 5 | 2 | 4 | 112 | |

| Middle Schools | [Grade] 6 | 7 | 8 | 9 | Total in Bilingual Program | Total Hispanics in School, Fall 1977 |
|---|---|---|---|---|---|---|
| Oregon Ave. | 5 | 1 | 2 | 2 | 10 | 39 |
| Saxton St. | 3 | 1 | 1 | 2 | 7 | 102 |
| So. Ocean Ave. | 7 | 8 | 10 | 7 | 32 | 85 |
| Total of Grade | 15 | 10 | 13 | 11 | 49 | |

| Senior High School | [Grade] 10 | 11 | 12 | Total in Bilingual Program | Total Hispanics in School, Fall 1977 |
|---|---|---|---|---|---|
| | 11 | 11 | 3 | 25 | 176 |
| TOTAL STUDENTS | | | | 186 | |

163 of the 186 students in the bilingual education program emigrated from Puerto Rico.

*The Bilingual Teaching Staff.*

In 1978 the school district's Spanish bilingual program consisted of six full-time bilingual teachers, one part-time bilingual teacher and six bilingual aides. The bilingual teachers report to and are evaluated by Mr. Rossi and the principals of the schools. Mr. Rossi does not speak Spanish; he is unfamiliar with the methodology of teaching English as a second language and has neither education nor training in bilingual education. It appears that the principals who are called upon to evaluate the performance of bilingual teachers are unfamiliar with bilingual teaching methods and do not understand Spanish. They only observe the teachers as required "according to the contract between the Teachers Union and the Board of Education". (Rossi, Tran. p. 28)

Of the bilingual teachers appointed since the commencement of this action only Dr. Ferdinand Contino (whose native language is English) and Mrs. Estrella Lopez (whose native language is Spanish) appear to have the formal training for bilingual teaching. The record indicates that the other bilingual teachers hired in 1975 are qualified to teach Spanish, but that they lack formal training in the methodology of Spanish bilingual teaching.

*Identification.*

Prior to 1975, identification of children with English language deficiencies was made on an informal basis, through either observations made by school personnel or by a child's or parent's admission of language

difficulties. In May 1975,[5] the school district, on Mr. Hauser's recommendation, administered two subtests of the Stanford Achievement Test (listening comprehension and vocabulary) solely to assess proficiency in spoken English.[6] It does not measure reading or writing skills in English or Spanish.

In June 1977 the school district conducted a Language Dominance Survey of all Hispanic children who had exhibited language deficiencies on the Stanford Achievement test in 1977. (Hauser Tran. p. 685)[7]

*The Transitional Program.*

As defendants view their obligations, it is to "teach the child to be able to read and write English within three years." (Hauser Trans. p. 672).

Students with English language deficiencies are instructed in English with their English speaking counterparts unless the classroom teacher recognizes a need for bilingual instruction. (Rossi Tran. p. 42).[8]

There is no established procedure for referring students to bilingual instructors. Often a student's language deficiency comes to the attention of a bilingual teacher only in an informal manner, e. g., in casual conversation among teachers at lunch. In the middle schools and high school, the bilingual teacher is made aware of a student's need for instruction when it happens to be mentioned in casual conversation with other teachers or when evidence of it somehow crosses his path.[9]

Instruction for English language deficient students is in the English language. Some instruction is offered to kindergarten students and first-graders in Spanish; but in each successive grade such students receive less instruction in Spanish and few continue in the program in the middle schools—none in the high school. No text books in Spanish are available. English language deficient students receive an average of 40 to 50 minutes a day in subject matter instruction in Spanish and the remainder of the school day in English. (Rossi Tran. p. 47). The program does not have sequentially planned instruction in subject matters in Spanish. Nor does it offer Spanish cultural instruction.

The school district's bilingual education program is basically a course in English. English is taught to Spanish speaking children during periods when their English speaking counterparts are instructed in science and social studies. (Cabrera Tran. p. 1255).

*Exiting Students From the Bilingual Program.*

No standard test is used to determine when the student has reached the required level of competency in English. The Stanford Achievement Test, which measures the capability of the child to understand spoken English, is the usual test for exiting a child

5. Mr. Hauser testified that from the time he became Director of Pupil Service in 1972 to 1975 he made an exhaustive search for a diagnostic test (to determine a child's competency in English) and a mastery test (to monitor a child's progress).

6. Dr. Raymond J. Sullivan called by defendants as an expert on evaluation designs for bilingual education programs had written Mr. Hauser on April 23, 1975 recommending tests for all grade levels to measure "the ability of these children to comprehend spoken English." (Ex. 7). The Stanford Achievement Test had been available since 1973 (Ex. 8).

7. The survey attempted to identify the language first acquired, the language most often spoken at home and the language most often spoken in social situations.

8. The exception is the River Ave. School where the Open Court Bilingual Program (deriving its name from Open Court Publishing Co.) is given to first graders. It consists of six children. The instruction is in Spanish and then translated into English.

9. Dr. Cabrera testified:

"Q. How do you coordinate the program with the classroom teachers?

"A. First in a very informal manner. Just when we are in the cafeteria, in the lunchroom, we talk about the students. They are mainly the topic of our conversations. So, I know how they are doing, what they need. Otherwise when I see that the person needs special attention, I go personally to see the teacher and to discuss the situation with the teacher and with the counselor also, the guidance counselor." (Tran. p. 1233).

from the English as a Second Language ("ESL") Program.[10] At times bilingual teachers make the determination; at times students are dismissed from the program against the advice of the bilingual teacher (Remien deposition p. 55).

*Defendants' Position.*

Defendants argue: (1) there are not enough pupils with English language deficiencies in the District to warrant application of the *Lau* Guidelines as a minimum standard; (2) nevertheless the Transitional Bilingual Program of the school district is in substantial compliance with the *Lau* Guidelines; (3) the program is "highly effective and successful in achieving its objectives" (Defendants' Post-Trial Fact Memorandum, pps. 62–63); and (4) the Bilingual Education Act of 1974, 20 U.S.C. § 880b et seq. is not applicable.

*Discussion.*

The threshold question of jurisdiction is presented on defendants' argument that primary jurisdiction of plaintiffs' claim lies with HEW and that this court acquires jurisdiction only upon the exhaustion of the administrative remedies available under the regulations promulgated by HEW. Appellate authority on this specific issue is lacking.

Recently, the Supreme Court while assuming for the purpose of the case before it that Title VI granted a private right of action, held it "need not pass upon [the] claim that private plaintiffs under Title VI must exhaust administrative remedies." *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 2745, 57 L.Ed.2d 750 (1978).[11]

■ The procedures established by HEW to effectuate the provisions of Title VI (45 C.F.R. § 80) are designed to seek voluntary compliance with the statutory mandate. If "noncompliance cannot be corrected by informal means, compliance . . . may be effected by suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law." (45 C.F.R. § 80.8) Such administrative proceedings are not designed to give the type of relief that is available in the District Court. They may, in fact, defeat the purpose of the private litigant by terminating the allocation of funds and the bilingual program. Plaintiffs seek continuance of the funding in order to provide an adequate bilingual program in compliance with Title VI. There is some lower court authority for the proposition that exhaustion of administrative remedies is a prerequisite to bringing suit under Title VI. *See Taylor v. Cohen,* 405 F.2d 277 (4th Cir. 1968); *NAACP v. Wilmington Medical Center, Inc.,* 426 F.Supp. 919 (D.Delaware 1977); *Dupree v. City of Chattanooga, Tennessee,* 362 F.Supp. 1136 (E.D. Tenn.1973). These cases are inapposite. They involved either efforts to enjoin administrative action which had already commenced, or to obtain from the courts the same type of relief which could be had under the administrative apparatus provided under Title VI. None of the cases involved situations, like the one at bar, where following the administrative procedures would frustrate the very purpose of plaintiff's suit and destroy the opportunity for a nondiscriminatory education program. The court believes that, at least in the situation before it today, the doctrines of primary jurisdiction and exhaustion of administra-

10. Dr. Sullivan testified that the score on the Stanford test alone is an unreliable test for eliminating a student from a bilingual program (Sullivan Tran. pps. 306–308).

11. The Court did not pass on whether a private right of action may be implied under Title VI since it "was neither argued nor decided in either of the courts below. . . ." Mr. Justice Stevens' concurring opinion (joined by the Chief Justice, Mr. Justice Stewart and Mr. Justice Rehnquist) noted that "[t]o date, the courts, including this Court, have unanimously

concluded or assumed that a private right of action may be maintained under Title VI." 95 S.Ct. at 2814. The issue was not raised here. As in *Bakke and Lau v. Nichols,* 414 U.S. 563, 571 n.2, 94 S.Ct. 786, 790, 39 L.Ed.2d 1 (1974) the court assumes that plaintiffs have a private right of action. Were the issue raised we would find that Congress intended the private plaintiffs have a right of action under Title VI. *Serna v. Portales Municipal Schools,* 499 F.2d 1147, 1152–1154 (10th Cir. 1974).

tive remedies are not a bar to suit under Title VI. This result is strongly suggested by numerous instances in which private litigants have been allowed to prosecute claims under Title VI without requiring exhaustion of administrative remedies. See *Regents of the University of California v. Bakke, supra; Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Jefferson v. Hackney,* 406 U.S. 535, 549–50, 92 S.Ct. 1724, n. 19, 32 L.Ed.2d 285 (1972); *Serna v. Portales Municipal Schools,* 499 F.2d 1147 (10th Cir. 1974); *Gautreaux v. Romney,* 448 F.2d 731 (7th Cir. 1971); *Pabon v. Levine,* 70 F.R.D. 674 (S.D.N.Y.1976).

The administrative procedures under Title VI provide no effective remedy to the plaintiffs. To require exhaustion of administrative remedies would be futile and counter-productive. Deference to HEW Administrative procedures would be inappropriate in this case. See *Rosado v. Wyman,* 397 U.S. 397, 405–406, 90 S.Ct. 1207, 1214–1215, 25 L.Ed.2d 442 (1970).

*The Lau Guidelines—The Statutory Obligations.*

In the wake of *Lau v. Nichols, supra,* the Office of Civil Rights of HEW created a task force with a view to establishing standards of compliance with the statutory provisions of Title VI and the regulations issued thereunder relating to educational programs.[12]

In the summer of 1975 the task force made its findings and specified "Remedies Available For Eliminating Past Educational Practices Ruled Unlawful Under *Lau v. Nichols*". The Office of Civil Rights uses the Lau remedies (or guidelines) in determining whether a bilingual school district program is in compliance with Title VI.[13]

Defendants do not challenge the use of the Lau Guidelines as an internal document of the Office of Civil Rights, but they question its use and/or value in the case at bar. In claiming primary jurisdiction for HEW, they apparently would not object to application of the guidelines by HEW. The guidelines do nothing more than supply the mechanism for testing compliance with Title VI as administered pursuant to its regulations, 45 C.F.R. §§ 80.3(b)(i)(ii) and (iv).[14] The use of the guidelines is not restricted to administrative procedures.

Defendants interpret the Lau Guidelines as supporting "maintenance" bilingual programs (citing the deposition of Noel Epstein at p. 28). The court does not interpret the Lau Guidelines as expressing any philosophy of bilingual education. It merely sets standards for determining compliance with the statutory obligations relating to bilingual education.

■ The purpose of the statutes, *i. e.,* Title VI, § 204(f) of the Equal Educational Opportunities Act of 1974, the Bilingual Education Act of 1974, and the Civil Rights Act of 1871, as they relate to bilingual education is to assure the language-deficient child that he or she will be afforded

---

12. Earlier, in 1970, HEW had published a regulation interpreting Title VI which stated in pertinent part:

Where inability to speak and understand the English language excludes national origin—minority group children from effective participation in the educational program offered by a school district, the district must take affirmative steps to rectify the language deficiency in order to open its instructional program to these students. 35 Fed.Reg. 11595.

13. Robert J. Baca, an attorney on the staff of General Counsel to the Office of Civil Rights testified that when a complaint of a Title VI violation relating to a bilingual program is filed, the investigators use the Lau Guidelines. "The Lau Guidelines is the material used to tell you what to look for when you go in and do an investigation." (Baca Deposition, p. 15). He indicated that a school district's compliance with Title VI is measured against the "Lau Analysis Form." (Baca deposition, p. 12).

14. 45 CFR §§ 80(3) b(ii) and (iv) provide that recipients of *any* program may not

"(ii) Provide any service, financial aid, or other benefit which is different, or is provided in a different manner from that provided to others under the program;

(iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid or other benefit under the program;"

the same opportunity to learn as that offered his or her English speaking counterpart. Taken together, the statutes, and the legislative history, *see* discussion in *Cintron v. Brentwood Union Free School District*, 455 F.Supp. 57 (E.D.N.Y.1978), mandate teaching such children subject matter in their native tongue (when required) by competent teachers. Though not expressly provided by statute, the legislative history suggests that the program must also be bi-cultural as a psychological support to the subject matter instruction. *Serna v. Portales Municipal Schools, supra*; H.R.Rep. 93–805, 93rd Cong. 2nd Sess., *reprinted* in [1974] U.S.Code Cong. & Admin.News, p. 4093.[15]

### The Bilingual Program—The Staff.

Prior to the institution of this action the teaching staff of bilingual teachers consisted only of Dr. Cabrera and Mrs. Catullo. Four teachers have been added to the staff since the commencement of this action. The teachers have had little or no training in bilingual educational programs or methodology. The District failed to provide in-service training for bilingual teachers or a program of continuing education in the field.

### Type of Program.

The bilingual program before commencement of this action was almost totally geared toward teaching English as a second language (ESL). Subsequent to the commencement of this action, Hispanic students were offered instruction in Spanish upon request or the chance choice or whim of the home class teacher, bilingual teacher or principal.

The program is designed to "mainstream" the student as soon as he or she indicates some comprehension of spoken English. In kindergarten and the first three grades, the curriculum is basically reading and mathematics; in the fourth and fifth grades, the curriculum is basically science and social studies. Language deficient students are in the same home class as English speaking students. When the student is identified by the home class teacher, or the bilingual teacher or principal as being unable to comprehend the instruction, he or she is then referred to the bilingual teacher for instruction in the subject matter in Spanish. Evaluation of the ability of language deficient students is based on the opinion of the home teacher or bilingual teacher. In the middle school[16] the amount of bilingual instruction and type of instruction is determined by the bilingual teacher and/or the home class teacher. In the high school, the bilingual teacher and aide are available for students who attend during their free periods.[17]

The bicultural program is limited in the high school to a course in Puerto Rican studies taught in Spanish and some extracurricular activities, e. g., special events, clubs, etc. In the middle and elementary schools some reading material relating to Spanish history and art is made part of social studies and literature. The District encourages other Spanish events and activities outside the school curriculum, e. g., Puerto Rican Discovery celebration, Christmas celebration consistent with Hispanic culture and tradition.

### Identification of English Language Deficient Students.

Since May 1975, the school district has been testing Hispanic students for oral English proficiency. The test, known as

---

**15.** The report states the need of "the use of two languages, one of which is *English*, as the media of instruction in a comprehensive school program. There is evidence that use of the child's mother tongue as a medium of instruction concurrent with an effort to strengthen his command of English acts to prevent retardation in academic skill and performance. The program is also intended to develop the child's self-esteem and a legitimate pride in both cultures. Accordingly, a bilingual education normally includes a study of the history and cultures associated with the mother tongue."

**16.** Mrs. Remien, the bilingual teacher, testified that she had 19 students in the ESL program and 13 additional students who came to her for Spanish instruction in particular subjects.

**17.** Only two to five students in each class are language deficient.

the Stanford Achievement Test, consists of two subtests: one for listening comprehension and one for vocabulary. As previously discussed, it does not measure reading or writing skills in English. In 1977 the District made a Language Dominance Survey of the Hispanic students who received scores in the lowest three stanines,[18] on the Stanford Achievement Test. The survey identified the language that was: (i) first acquired, (ii) most often spoken in the home, (iii) most often spoken in social situations. Students were classified according to their language skills. Those who were mono-lingual Spanish or spoke Spanish predominantly were placed into the ESL program. Those who were bilingual or spoke only English were not included in the program.

*Mainstreaming.*

Students are exited from the bilingual or ESL program on the determination by the bilingual teacher without any objective or validated test. Students have been found to have reached the level of competency in English which qualifies them for instruction in English by retesting on the Stanford Achievement Test. The test is not valid for that purpose.[19]

*Conclusion.*

Defendants describe the school district's bilingual program as "a transitional bilingual program stressing ESL and including substantive bilingual instruction in content courses with bilingual components as a part of these text materials supplemented by bi-cultural activities. . . ." They argue that the program is "highly effective and successful in achieving its objective." (Def. Post Trial Memo., p. 63).

However, plaintiffs' charge that they are being denied equal educational opportunity is not sufficiently answered by defendants' efforts to show that their program will eventually attain some desirable results. A denial of educational opportunities to a child in the first years of schooling is not justified by demonstrating that the educational program employed will teach the child English sooner than programs comprised of more extensive Spanish instruction. While the District's goal of teaching Hispanic children the English language is certainly proper, it cannot be allowed to compromise a student's right to meaningful education before proficiency in English is obtained.

Thus, the statutory obligations upon the school district require it to take affirmative action for language-deficient students by establishing an ESL and bilingual program and to keep them in such program until they have attained sufficient proficiency in English to be instructed along with English-speaking students of comparable intelligence. The school district has the obligation of identifying children in need of bilingual education by objective, validated tests conducted by competent personnel. It must establish procedures for monitoring the progress of students in the bilingual program and may exit them from the program only after validated tests have indicated the appropriate level of English proficiency.

The school district is not obligated to offer a program of indefinite duration for instruction in Spanish art and culture. The bicultural element is necessary only to enhance the child's learning ability. The purpose is not to establish a bilingual society.

Measured against these obligations the school district's bilingual program is inadequate. It violates plaintiffs' statutory

---

18. Stanines indicate a range of competency from one to nine. The survey was conducted of only those students scoring in the first three stanines, though 139 students in the fourth stanine were below average in oral English comprehension.

19. In describing the effectiveness of the program, Mr. Hauser, using the categories defined in the Lau Guidelines from A to E testified that most of the children in the bilingual program are in B categories, *i. e.* predominantly speak a language other than English ("speaks mostly the language other than English, but speaks some English") and after three years in the program are in either C category ("Bilingual"), D category ("Predominantly speaks English") or E category ("Monolingual speaker of English").

right to equal educational opportunities under Title VI of the Civil Rights Act of 1964, and the Civil Rights Act of 1871, the Equal Educational Opportunities Act of 1974, and the Bilingual Education Act of 1974.

*Disposition.*

The school district is directed to file with the Clerk of this Court a proposed plan for a bilingual educational program in accordance with this memorandum of decision on or before January 31, 1979 and serve a copy of the proposal on plaintiffs on or before December 15, 1978. Plaintiffs shall serve objections (if any) to the plan on defendants on or before January 15, 1979. The plan shall comply with the Lau Guidelines.

The court retains jurisdiction over the subject matter of this action for the purpose of making further orders to carry out the provisions of the Judgment to be entered herein.

This Memorandum of Decision contains the findings of fact and conclusions of law required under Rule 52.

The Court has simultaneously herewith approved the form of Judgment to be entered in favor of the plaintiffs and against the defendants. The Clerk of the Court is directed to enter the said Judgment. (F.R. C.P. Rule 58). It is

SO ORDERED.