**UNITED STATES of America, Plaintiff,**

**Mexican American Legal Defense Fund, Lulac and G. I. Forum, Plaintiffs-Intervenors,**

**v.**

**STATE OF TEXAS et al., Defendants.**

**Civ. A. No. 5281.**

United States District Court, E. D. Texas, Tyler Division.

Jan. 12, 1981.

408

Joseph D. Rich, David Brinbaum, Richard Epps, Terry Milton, Jeremiah Glassman, Civ. Rights Div., Dept. of Justice, Washington, D. C., Drew S. Days, III, Asst. Atty. Gen., Washington, D. C., John H. Hannah, Jr., U. S. Atty., E. D. Texas, Tyler, Tex., for plaintiff.

Peter D. Roos, Vilma S. Martinez, Linda Hanten, Ricardo De Anda, Mexican-American Legal Defense and Education Fund (MALDEF), San Francisco, Cal., Roger Rice, Harvard Center for Law and Education, Cambridge, Mass., Norma Solis, Mexican-American Legal Defense and Education Fund (MALDEF), San Antonio, Tex., for plaintiffs-intervenors.

Susan J. Dasher, Asst. Atty. Gen. of Texas, Mark White, Atty. Gen. of Texas, John W. Fainter, Ted L. Hartley, Paul R. Gavia, Roland Allen, David M. Kendall, Steve Bickerstaff, Robert Giddings, Asst. Attys. Gen., Austin, Tex., for defendants.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

### I. PROCEDURAL HISTORY.

This civil action was instituted by the United States on March 6, 1970. The complaint charged that the defendant State of Texas and its agents, including the Texas Education Agency (hereinafter referred to as "TEA"), had created and maintained nine all-Black school districts throughout the state and had failed to provide equal educational opportunity without regard to race. The complaint further alleged that the State of Texas, through the TEA—as the chief supervisory body of public education in Texas and as the disburser of state educational assistance and federal funds—, had failed to oversee and supervise the school districts within the state, to ensure that no child was denied the benefits of federally-supported programs on the grounds of race, color, or national origin.

A trial was held in September, 1970. In an order entered November 24, 1970, the defendants were found to be in violation of both the Constitution and federal law. Accordingly, TEA was required to desegregate the all-Black districts and to submit a comprehensive enforcement plan to ensure equal educational opportunity for all students in the state. D.C., 321 F.Supp. 1043 (1970). After the submission of a proposed plan and a series of hearings, an order was entered mandating that TEA implement a comprehensive enforcement plan, which was set forth in conjunction with the order. D.C., 330 F.Supp. 235 (1971).

With minor modifications, the Court of Appeals for the Fifth Circuit subsequently affirmed the November 24, 1970, order. 447 F.2d 441 (1971). A revised order was issued on July 13, 1971, to conform with the directives of the Court of Appeals. Justice Black thereafter denied a motion by the state defendants to stay implementation of this order, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed.2d 10 (1971), and *certiorari* was subsequently denied by the Supreme Court. 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972). Thus, the revised order of July 13, 1971, remains in effect in this action.

Section G of the order, entitled "Curriculum and Compensatory Education", required the TEA to carry out a study of the educational needs of minority children throughout the state and to report his findings to the court by August 15, 1971. The report was to include, *inter alia*,

(a) Recommendations of specific curricular offerings and programs which will insure equal educational opportunities for all students regardless of race, color or national origin. These curricular offerings and programs shall include specific educational programs designed to compensate minority group children for unequal educational opportunities and ethnic isolation, as well as programs and curriculum designed to meet the special educational needs of students whose primary language is other than English;

(b) Explanation of presently existing programs funded by the State of Texas or by the Federal Government which are available to local districts to meet these special educational needs and how such programs might be applied to these educational needs;

(c) Explanation of specific standards by which the defendants will determine when a local district, which has racially or ethnically isolated schools or which has students whose primary language is other than English, shall be required by the defendants to participate in the special compensatory educational programs available; and

(d) Explanation of procedures for applying these standards to local districts including appropriate sanctions to be employed by the defendants should a district refuse to participate in special compensatory educational programs where it has been instructed to do so pursuant to application of the standards developed under subsection (c) above.

TEA filed a timely response to the Section G requirements, in the form of an 86-page document entitled "T.E.A. Plan for Meeting Requirements of Section G" and a 17-page document entitled "Alternative Programs to Improve Curriculum for Minority Students". In submitting these reports, the agency did all that it had been required to do under Section G. No other specific actions were immediately mandated by the order directing TEA to address the learning problems of students whose primary language was other than English. TEA's proposals, as contained in these two documents, were never the subject of a hearing, nor was any order entered which approved or rejected them.

Another pertinent section of the order of July 13, 1971, Part J(1), provided:

This Court retains jurisdiction of this matter for all purposes, and especially for the purpose of entering any and all future orders which may become necessary to enforce or modify this decree.

It is this provision which authorizes consideration to be given to the supplemental claims which have now been brought.[1]

A motion to intervene, filed by the GI Forum and the League of United Latin American Citizens (LULAC), was granted on July 10, 1972, which allowed such parties to participate in this action "for all purposes as representatives of all persons of Mexican-American descent or nationality in the State of Texas." On June 3, 1975, the GI Forum-LULAC intervenors moved for enforcement of Section G of the court's prior order and for supplemental relief, claiming that Mexican-American students in the Texas public schools were being denied equal educational opportunity as required by law. In their demand for relief, the intervenors called for TEA to implement a plan which would provide all limited English proficiency students with bilingual instruction and compensatory programs, to overcome the effects of the unavailability of bilingual instruction in the past. An amended motion, naming twenty-six individual Mexican-American children as party plaintiffs, was subsequently filed. The United States has also moved for enforcement of Section G and for supplemental relief which is similar, though not identical, to that demanded in the motion filed by the GI Forum-LULAC intervenors.

At the trial of the case, the parties submitted voluminous documentary materials and numerous stipulations of fact, which were received in evidence. Following trial, all parties submitted extensive post-trial memoranda. This memorandum opinion contains findings of fact and conclusions of law as to these claims, as authorized by F.R.CIV.P. 52(a).

As noted above, the response of the court in 1971 to the special educational needs of limited English proficiency children was simply to require the report described in Section G. The trial of the case had primarily focused upon the existence of a dual school system in Texas based upon race. While evidence was received on the maintenance of separate schools for children of Mexican-American ancestry throughout the state, no expert testimony was offered on the related problem of ethnic-based language barriers. Thus, while it was determined that equal educational opportunity should be afforded to Spanish-speaking students, no record existed on which to base specific findings as to the extent of the language problem in the state's public schools or how that problem could best be remedied.

The study and report by TEA called for in Section G were intended to begin the process of eliminating the vestiges of discrimination against these children in the field of education by dealing directly with the language barrier. But the suggestion by plaintiffs that the comprehensive bilingual education program they now seek was somehow inherent in Section G and must now be implemented under the doctrine of *res judicata* is erroneous. Section G of the court's 1971 order required only the filing of a report to propose remedial programs. That requirement was satisfied in a timely manner by TEA. Section G contained no specific guidelines concerning the scope or characteristics of any compensatory program. Given the paucity of evidence which had been received on the language problem at that time, such specificity would have been unwarranted. If the extensive relief now sought by plaintiffs is appropriate, it must be predicated upon the mass of evidence presented at trial. Accordingly, the

---

1. A number of actions in addition to the one addressed in this opinion have been brought under the aegis of the order of July 13, 1971. For example, segregation of Mexican-American students in the San Felipe and Del Rio Independent School Districts, in violation of the court's order, was alleged in 1971. Unconstitutional discrimination was found and relief was ordered. *United States v. Texas*, 342 F.Supp. 24 (E.D.Tex.1971) (*San Felipe Del Rio Consolidat-ed Independent School District*). In another suit spawned by the original 1971 court order, intentional, statewide discrimination against Mexican-American students was found to be practiced by TEA. *United States v. Texas*, 498 F.Supp. 1356 (E.D.Tex.1980) (*Gregory-Portland Independent School District Intervention*). The *Gregory-Portland* decision, discussed in greater detail below, touched upon many of the same issues involved in the instant action.

plaintiffs' claim for relief as a means of enforcing Section G of the court's 1971 order will be denied.

## II. DE JURE DISCRIMINATION UNDER THE FOURTEENTH AMENDMENT.

### A. *Scope and Impact of the Violation.*

The evidence presented on the motions for supplemental relief contains proof of pervasive, invidious discrimination against Mexican-Americans throughout the State of Texas. The extent of the discrimination is comparable in magnitude to the overwhelming evidence of state-supported racial segregation which was found more than ten years ago. *United States v. Texas*, 321 F.Supp. 1043 (E.D.Tex.1970), *aff'd.* 447 F.2d 441 (5th Cir. 1971). The serious injustices which the Mexican-American minority in Texas has endured at the hands of the Anglo[2] majority is undeniable. Defendants, the State of Texas and the Texas Education Agency, stipulated to facts documenting this history of discrimination, and defendants' counsel opened her case by conceding: "[T]he State of Texas does not have a happy record over the past." Trial Transcript (TR) 21.

Historical discrimination against Mexican-Americans in the United States has been conclusively established by prior court decisions. *E. g., Keyes v. School District No. 1, Denver, Colo.*, 413 U.S. 189, 197–98, 93 S.Ct. 2686, 2691–92, 37 L.Ed.2d 548 (1973); *Graves v. Barnes*, 343 F.Supp. 704, 728 (W.D.Tex.1972) (three-judge court) *(per curiam), aff'd in pertinent part, sub nom. White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). The extensive disabilities suffered by this minority group in Texas was aptly described in *Graves v. Barnes* as follows:

Because of long-standing educational, social, legal, economic, political and other widespread and prevalent restrictions, customs, traditions, biases, and prejudices, some of a so-called *de jure* and some of a so-called *de facto* character, the Mexican-American population of Texas, which amounts to about 20%, has historically suffered from, and continues to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others.

*Id.* Both the Supreme Court and the Court of Appeals for the Fifth Circuit have recognized that Mexican-Americans comprise a distinct ethnic class for purposes of equal protection under the Fourteenth Amendment. *Keyes*, 413 U.S. at 197, 93 S.Ct. at 2691; *Hernandez v. Texas*, 347 U.S. 475, 479, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954); *United States v. Texas Education Agency*, 467 F.2d 848, 852 (5th Cir. 1972) *(en banc), aff'd after remand* 532 F.2d 380 (5th Cir. 1976), *remanded sub nom. Austin Independent School District v. United States*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), *aff'd.* 564 F.2d 162 (5th Cir. 1977), *cert. denied* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979) (Austin Independent School District).

In the field of public education, discrimination against Mexican-Americans in Texas has been particularly acute. Although ethnic segregation was not mandated by law, as was segregation by race, Tex.Const., Art. 7, § 7 (1876), segregation of Mexican-Americans is a historical fact in Texas public schools. Plaintiff-Intervenors' Exhibit 409, # 701.[3] Beginning in the early years of this century, the establishment of "Mexican schools" took root in the Rio Grande Valley and spread gradually throughout the state. By 1942, such segregated schools existed in at least 122 Texas school districts in fifty-

---

**2.** The term "Anglo" shall be used throughout this memorandum opinion in referring to caucasians, *i. e.*, those persons who are neither Mexican-American nor Black nor members of any other racial or ethnic minority which is generally identified as "non-White".

**3.** Some 456 stipulations of fact, agreed to by all parties, were set forth in a single document entitled "STIPULATIONS" and introduced at the opening of trial as Plaintiff-Intervenors' Exhibit 409. References to specific stipulations contained within this exhibit will be abbreviated as "Pl.-Int. Ex. 409, # · - " throughout this opinion.

nine different counties. Pl.-Int. Ex. 409, # 729.

State and local education officials justified this practice of segregation, on the grounds that Mexican-American children spoke little English and were often late in arriving at school because their families engaged in migrant labor. *See, e. g., Independent School District v. Salvatierra*, 33 S.W.2d 790, 791–93 (Tex.Civ.App.—San Antonio 1930), *cert. denied* 284 U.S. 580, 52 S.Ct. 28, 76 L.Ed. 503 (1931). In fact, the discrimination was not at all benign. No attempt was made to meet the special educational needs of these children, who had limited proficiency with the English language. Pl.-Int. Ex. 409, # 706. On the contrary, the "Mexican schools" were invariably overcrowded, and were inferior in all respects to those open exclusively to Anglo students. Pl.-Int. Ex. 409, # 748.

In furtherance of this state policy, Mexican-American children were prohibited from speaking their native language anywhere on school grounds. Those who violated the "No Spanish" rule were severely punished. Pl.-Int. Ex. 409, # 710, 711. The statute and rules prohibiting the use of Spanish in the public schools were strictly enforced until 1968. Pl.-Int. Ex. 409, # 514. Rather than attempting to provide adequate schooling for Mexican-American children, Texas educators viewed public education as simply a vehicle for "Americanizing" the "foreign element". Pl.-Int. Ex. 409, # 738. Both the language and cultural heritage of these children were uniformly treated with intolerance and disrespect.

While many of these discriminatory practices were carried out primarily at the local level, the state itself was directly implicated as well. Official publications of the Texas State Department of Education, the predecessor of TEA, reflected a policy of Anglo racial domination over Mexican-American people, their language, and culture. Pl.-Int. Ex. 409, # 704. The state approved construction bonds which school board minutes indicate were explicitly designed for the construction or repair of segregated "Mexican schools". Pl.-Int. Ex. 409, # 750. Even after the illegality of segregating Mexican-American children was clearly established in a 1948 federal court decision, *Delgado v. Bastrop Independent School District*, C.A. No. 388 (W.D.Tex.) (unreported), state education authorities cooperated to allow local districts to evade that mandate. Pl.-Int. Ex. 409, # 735.

■ The legal consequences flowing from this pattern of discrimination must be ascertained through current constitutional standards. Recent Supreme Court decisions have established that proof of discriminatory intent or purpose is required to make out a violation of the Equal Protection Clause. *Columbus Board of Education v. Penick*, 443 U.S. 449, 464, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977) (*Dayton I*). In the absence of such forbidden purpose, school policies which bring about discriminatory results are not unconstitutional. *Keyes v. School District No. 1, Denver, Colo.*, 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973).[4]

■ Discriminatory purpose is most clearly evident where a dual school system, segregated on the basis of race, has been established by law. Such statutory discrimination is unconstitutional *per se* under *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*); *United States v. Texas Education Agency*, 564 F.2d 162, 165, fn. 2 (5th Cir. 1977) (*Austin III*).

Most recent Equal Protection claims in the field of education have been brought against school systems where discrimination was effectuated by local acts and policies, rather than by law. *E. g., Columbus Board*

---

4. Prior to the Supreme Court's decision in *Keyes*, the Court of Appeals for the Fifth Circuit had held that proof of discriminatory impact was sufficient to make out a violation of the Fourteenth Amendment. *E. g., Cisneros v. Corpus Christi Independent School District*, 467 F.2d 142 (1972) (*en banc*). Thus, the issue of intent was not raised when this court rendered its initial decision in *United States v. Texas* in 1971.

of Education v. Penick; Dayton Board of Education v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (Dayton I), after remand, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (Dayton II). Such discrimination, if intentional, is no less forbidden by the Constitution. Columbus Board of Education v. Penick, 443 U.S. at 457, fn. 5, 99 S.Ct. at 2946, fn. 5; Cisneros v. Corpus Christi Independent School District, 467 F.2d at 147. But the post hoc determination of why these various acts and policies were undertaken in the past is often difficult.

■ Discriminatory purpose may be inferred from the totality of relevant facts. Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). In order to prevail, the plaintiff must show that racial or ethnic discrimination was a purpose of the challenged conduct, though not necessarily the sole or dominant one. Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). If the disparate racial or ethnic impact of a particular policy could readily have been foreseen at the time it was implemented, that fact is relevant proof on the issue of whether that policy had an impermissible purpose. Columbus Board of Education v. Penick, 443 U.S. at 464, 99 S.Ct. at 2950.

■ Where systemwide discrimination is alleged, as in this case, proof of intentional discrimination within a substantial portion of that system creates a rebuttable presumption that the entire system is operating in violation of the Equal Protection Clause. Columbus Board of Education v. Penick, 443 U.S. at 458, 99 S.Ct. at 2947; Keyes, 413 U.S. at 203, 93 S.Ct. at 2695. Once impermissible intent is shown, the burden shifts to the defendant to prove that the same results would have occurred absent purposeful discrimination of any kind. Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); United States v. Texas Education Agency, 579 F.2d 910, 916 (5th Cir. 1978) (denying petition for rehearing) (Austin Independent School District).

■ In determining the presence of a constitutional violation, the remoteness in time of purposeful discrimination is not a viable defense. Keyes, 413 U.S. at 210–211, 93 S.Ct. at 2698. If a school system engaged in intentional discrimination on the basis of race or national origin at any time in the past, it bears an affirmative duty to eliminate all vestiges of that discrimination, root and branch. Dayton II, 443 U.S. at 537, 99 S.Ct. at 2979; Keyes, 413 U.S. at 201, 93 S.Ct. at 2694; Green v. County School Board, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). It is not enough for the defendants to abandon their prior discriminatory practices. Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979. All of the consequences of that unlawful conduct must be remedied. The failure or refusal to fulfill this duty to extirpate all remaining traces of intentional discrimination after the discrimination itself has ceased constitutes a separate violation of the Fourteenth Amendment. Columbus Board of Education v. Penick, 443 U.S. at 459, 99 S.Ct. at 2947.

Courts applying these legal principles have found intentional or "de jure" discrimination against Mexican-American children in a number of school districts throughout Texas. E. g., United States v. Texas Education Agency, 600 F.2d 518 (5th Cir. 1979) (Lubbock Independent School District); United States v. Texas Education Agency, 564 F.2d 162 (5th Cir. 1977), cert. denied, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979) (Austin III); Morales v. Shannon, 516 F.2d 411, 413 (5th Cir. 1975), cert. denied, 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1976) (Uvalde public schools); United States v. Midland Independent School District, 519 F.2d 60, 64 (5th Cir. 1975).

A separate segment of this action, involving a claim of unconstitutional segregation suffered by Mexican-American students in the Gregory-Portland Independent School District, was decided in United States v. State of Texas, 498 F.Supp. 1356 (1980) (Gregory-Portland Independent School District Intervention). There, intentional, statewide discrimination against Mexican-

American students was found to have been practiced by TEA. It was also determined that TEA had failed to satisfy its obligation to eliminate the vestiges of that unconstitutional conduct throughout the state. While *Gregory-Portland* involved the continued segregation of Mexican-American students in school assignments, rather than their language-based learning difficulties, the court's decision that deliberate ethnic discrimination by TEA existed throughout the state's public schools bears directly upon the instant action.

On the basis of the evidence in this case, a conclusion identical to that reached in the *Gregory-Portland* case is inescapable. There can be no doubt that a principle purpose of the practices described above was to treat Mexican-Americans as a separate and inferior class. Three distinct forms of deliberate discrimination were engaged in. First, these children were restricted on the basis of their ancestry to so-called "Mexican schools". Second, they were provided with facilities, resources, and educational programs vastly inferior to those accorded their Anglo counterparts. Third, the native language and culture of these Mexican-American children were assailed and excluded in an effort to "Americanize" them. Viewed in the context of this concerted program of discrimination against students of Mexican ancestry, the policy of using English exclusively in the Texas public schools must be seen, not as neutral or benign, but rather as one more vehicle to maintain these children in an inferior position.

■ Intentional discrimination against this minority group, supported by state policies and state funding, characterized public education throughout Texas for many years. The defendants have made no showing that the documented instances of discrimination were isolated aberrations or otherwise outside the responsibility of state authorities. Accordingly, it is found that Mexican-Americans in Texas have been subjected to *de jure* discrimination by the defendants, the State of Texas and the Texas Education Agency, in violation of the Equal Protection Clause of the Fourteenth Amendment.

Having ascertained the existence of a constitutional violation, it is necessary to determine what consequences, if any, that violation has effected upon the victims of discrimination. The adverse impact of racial or ethnic segregation upon school children is well documented. As the Supreme Court observed more than a quarter-century ago, segregation "generates a feeling of inferiority as to their status in the community which may affect their hearts and minds in a way unlikely ever to be undone." *Brown v. Board of Education*, 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) (*Brown I*). Such treatment affects, not only educational achievement, but social and psychological development as well. *See United States v. Texas Education Agency*, 467 F.2d 848, 862, n. 21 (5th Cir. 1972) (*en banc*), aff'd after remand 532 F.2d 380 (5th Cir. 1976), *remanded sub nom. Austin Independent School District v. United States*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), aff'd. 564 F.2d 162 (5th Cir. 1977), *cert. denied* 443 U.S. 915, 99 S.Ct. 3106,. 61 L.Ed.2d 879 (1979). Other forms of discrimination, such as suppression of a child's native language and culture and the maintenance of inferior facilities for a particular minority group, compound the gravity of the consequences:

> Children who have been thus educationally and culturally set apart from the larger community will inevitably acquire habits of speech, conduct, and attitudes reflecting their cultural isolation. They are likely to acquire speech habits, for example, which vary from the environment in which they must ultimately function and compete, if they are to enter and be a part of that community. This is not peculiar to race; in this setting, it can affect any children who, as a group, are isolated by force of law from the mainstream.

*Milliken v. Bradley*, 433 U.S. 267, 287, 97 S.Ct. 2749, 2760, 53 L.Ed.2d 745 (1977) (*Milliken II*).

The general principles outlined above apply graphically and disastrously to Mexican-Americans in the state of Texas. Subjected to pervasive, intentional discrimination throughout most of this century, members of this minority group have been severely disabled in their struggle for equal educational opportunity. Defendants have conceded that "the long history of educational neglect of, and discrimination against, Mexican-Americans in Texas has had an adverse impact [on] the educational success of Mexican-American students." FINAL PRE–TRIAL ORDER at 93. More specifically, defendants acknowledge that negative stereotypes transmitted to Mexican-American students contribute to low achievement, and that "the 1918 'English Only' law had a severe and debilitating effect on the education of Spanish-speaking children for over 50 years." Pl.-Int. Ex. 409, # 8, 709.

While many of the overt forms of discrimination wreaked upon Mexican-Americans have been eliminated, the long history of prejudice and deprivation remains a significant obstacle to equal educational opportunity for these children. The deep sense of inferiority, cultural isolation, and acceptance of failure, instilled in a people by generations of subjugation, cannot be eradicated merely by integrating the schools and repealing the "No Spanish" statutes. *See Milliken II*, 433 U.S. at 288, 97 S.Ct. at 2761. In seeking to educate the offspring of those who grew up saddled with severe disabilities imposed on the basis of their ancestry, the State of Texas must now confront and treat with the adverse conditions resulting from decades of purposeful discrimination. The effects of that historical tragedy linger and can be dealt with only by specific remedial measures. *Id.*

Defendants recognize the continuing effects of their past *de jure* discrimination against Mexican-Americans. They stipulate that "the use of an all-English ethnocentric curricula which LESA [Limited English-Speaking Ability] children have been taught by monolingual English teachers and English textbooks has resulted in low achievement, frustration, and humiliation for Mexican-American children." Pl.-

Int. Ex. 409, 707. Defendants acknowledge further that negative stereotyping and racial isolation are forms of discrimination which still affect the educational experience of Mexican-American students and contribute to their low achievement. Pl.-Int. Ex. 409, # 8, 702.

The severe educational difficulties which Mexican-American children in Texas public schools continue to experience attest to the intensity of those lingering effects of past discriminatory treatment. Some forty-four percent of Mexican-American students suffer from severe reading retardation. Pl.-Int. Ex. 409, # 46. In a study of all sixth graders in the seven largest urban school districts in Texas, Anglo students were reading at an average grade achievement level of 6.21, while Mexican-American students lagged far behind at 4.81. Pl.-Int. Ex. 409, # 9.

As a result of low achievement in reading and other academic subjects, Mexican-American students are compelled to repeat grades far more frequently than Anglo students. More than twenty-two percent of Mexican-American first graders are retained in the same grade, compared to only seven percent of Anglo children. Pl.-Int. Ex. 409, # 47. Not surprisingly, these Mexican-American students, finding themselves behind their grade level peers in achievement, as well as older in age, leave school at a relatively high rate. Nearly one-half, or forty-seven percent, of Mexican-American pupils abandon school before graduation, compared to only fifteen percent of the Anglo students who fail to finish high school. More than one-half of Anglo students enter college, compared to only sixteen percent of their Mexican-American classmates. Pl.-Int. Ex. 409, # 41.

The educational problems of this minority group contribute significantly to their inability to compete successfully for the professional and technical jobs which provide some measure of comfort, status, and power in American society. The Supreme Court's assertion in *Brown v. Board of Education, (Brown I)*, that "it is doubtful that any

child may reasonably be expected to succeed in life if he is denied the opportunity of an education", 347 U.S. at 493, 74 S.Ct. at 691, is probably even more accurate now than it was then. *See* Gov.Ex. B7 at 1,14. The unemployment rate of Mexican-Americans in Texas is nearly twice that of nonminority adults, Pl.-Int. Ex. 409, # 5, but this is only another manifestation of the underlying problem. Without adequate educational training and credentials, these individuals are restricted to the least challenging and rewarding occupations which society offers. Thus, while they may ultimately be employed in some fashion, many Mexican-Americans continue to suffer throughout life from the educational opportunities they were denied as children.

The crippling educational deficiencies afflicting the main body of Mexican-Americans in Texas presents an ongoing ethnic tragedy, catastrophic in degree and disturbing in its latency for civil unrest and economic dislocation. A Mexican-American public school enrollment estimated at 813,325 registered in the 1980–81 school year, and a steady increase to 941,875 by 1983–84 is projected. Gov. Ex. K14. Unless the state succeeds in overcoming the vestiges of past discrimination and educates these children effectively, some one million members of this group will soon grow to maturity, unable to participate fully in or contribute meaningfully to this nation's society.

That the defendants' unconstitutional practices have contributed substantially to the special learning problems encountered by Mexican-American children and that vestiges of that past discrimination remain, producing deleterious results today, is uncontested. Defendants have conceded the direct, causal relationship between their past actions and current conditions in the Texas public school system. In particular, the defendants' treatment of these children as inferiors, prohibited from using their native language within the schools, was an act of purposeful discrimination with profound consequences. In effect, defendants' past conduct created a learning disability which

will continue to impede Mexican-American children until it is completely eradicated.

The record in this case demonstrates pervasive, systemwide discrimination against Mexican-American children in the field of education. The systematic nature of the violation constitutes proof, in itself, that current language-based learning problems suffered by these children was caused, at least in part, by prior unlawful actions by defendants. *See Dayton Board of Education v. Brinkman*, 443 U.S. 526, 537, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (*Dayton II*). Defendants bear the burden of demonstrating that current conditions would be unchanged in the absence of their discriminatory conduct. *Id.; Keyes v. School District No. 1, Denver, Col.*, 413 U.S. 189, 211, fn. 17, 93 S.Ct. 2686, 2699, fn. 17, 37 L.Ed.2d 548 (1973); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). No such showing was made at trial. Accordingly, the learning difficulties of Mexican-American students attributable to defendants' actions must be redressed, and the remaining vestiges of past discrimination must be eradicated.

It may well be that the learning difficulties suffered by Mexican-American children are caused in part by factors other than defendants' intentional discrimination. Any such factors, if proven, would be outside the bounds of plaintiffs' claim and thus beyond the scope of an appropriate remedy. *See Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977) (*Dayton I*). But the harms which have been identified here stem directly from defendants' unconstitutional conduct. It is undisputed that the prejudice openly manifested toward this minority group, its language and culture, throughout most of Texas' history since statehood, has left deep wounds which continue to infect the learning process. That specific cause must be recognized and the resulting harm directly addressed through appropriate remedial action. *Milliken v. Bardley (II)*, 433

U.S. 267, 282–290, 97 S.Ct. 2749, 2758–2762, 53 L.Ed.2d 745 (1977).[5]

B. *The Defendants' Failure to Remedy the Violation.*

(1) Overview of the State's Remedial Program.

The State of Texas first recognized the need to change its policies in educating Mexican-American children in 1969, when the legislature repealed the 1918 "English Only" law and permitted, for the first time, bilingual education by local school districts "in those situations when such instruction is educationally advantageous to the pupils." Tex.Ed.Code Ann., § 21.109 (Vernon 1970). Four years later, the state legislature enacted the Texas Bilingual Education Act of 1973. Tex.Ed.Code Ann., § 21.451 *et seq.* (Vernon 1980 supp.). The introductory policy statement of this law stated:

> The legislature finds that there are large numbers of children in the State who come from environments where the primary language is other than English. Experience has shown that public school classes in which instruction is given only in English are often inadequate for the education of children whose native tongue is another language. The legislature believes that a compensatory program of bilingual education can meet the needs of these children and facilitate their integration into the regular school curriculum. . . .
>
> § 21.451.

The statute required local school districts to determine the number of limited English-speaking students in their district, such students being defined as "children whose native tongue is a language other than English and who have difficulty performing ordinary classwork in English." § 21.452, 21.453(a). School districts with twenty or more of these children in any single language classification in any one grade were required to implement a bilingual education program for their benefit. § 21.453(b). Such a program was required to encompass grades one through six, to be brought to effect in phases, *i. e.*, a grade at a time, beginning with the first grade during the 1974–75 school year. Supplemental state funding was authorized to be paid to school districts operating bilingual programs mandated by this statute. § 21.460.[6]

In 1975, the Texas Legislature amended the 1973 law to reduce the overall scope of required bilingual programs. While adding a provision for bilingual instruction in kindergarten classes, the legislature eliminated mandatory bilingual programs in grades four, five, and six. Bilingual instruction in the fourth and fifth grades was made optional for school districts, with supplemental funding to be provided by the state. No state funds were to be available for bilingual education in grades six through

---

**5.** This is not a case, like *Dayton I*, where the incremental impact of isolated instances of discrimination can be quantified and specifically ascertained. Here, the proven violation is systemwide in its scope and impact. Moreover, generalized learning impairment, in contrast to statistically-imbalanced student populations, does not lend itself to such an analysis. In the former case, it is enough to identify a specific cause of present injury, produced by defendants' unconstitutional actions, and to devise a remedy which will eliminate that cause of harm. Such an approach is qualitative rather than quantitative in nature, but it fully satisfies the fundamental requirement that the scope of relief be determined by the scope of the violation and its resulting harm. *Swann*, 402 U.S. at 16, 91 S.Ct. at 1276.

**6.** The Texas Bilingual Education Act was not limited in scope to Mexican-American children. The statute encompassed all students with a native language other than English with learning difficulties. Yet the record indicates that more than ninety-five percent of all Texas schoolchildren with limited English-speaking ability are of Mexican-American ancestry, with Spanish as their dominant language. Throughout the remainder of this opinion, the attributes and effectiveness of the state's educational programs shall be assessed exclusively as they pertain to this class of Mexican-Americans, which has been victimized by the historical discrimination described above. Aside from Mexican-Americans, the legal sufficiency of the defendants' educational programs which involve students who speak other languages than English is beyond the scope of this litigation and will not be addressed in this opinion.

twelve. The amendments enacted in 1975, together with the 1973 Bilingual Education Act, remain in effect, unchanged, to this date.

During the course of this litigation, the State Board of Education approved a new State Plan for Bilingual Education which embodies the provisions of the statute. Gov. Ex. D-13. The plan, adopted on November 11, 1978, contains detailed regulations concerning the identification of limited English-speaking ability students, the components of bilingual programs, and procedures for transferring a child from bilingual instruction into the regular curriculum. The new plan also requires school districts to provide special English language development programs to students in grades one through twelve who have limited English-speaking ability but are not receiving bilingual instruction. Although this plan had not been fully implemented throughout Texas schools by the time this case was tried, it must be treated as the state's current response to its duty to eradicate the vestiges of past discrimination against Mexican-Americans and be evaluated on that basis.

> (2) Concept of Bilingual Education and Related Remedial Programs.

Both the state's existing education policies toward Mexican-American students and plaintiffs' claims in this action focus on the use of bilingual instruction. An understanding of the concept of bilingual education is a prerequisite to evaluating the programs currently in operation throughout the state. A bilingual education program is defined by Congress in the "Bilingual Education Act", 20 U.S.C.A. § 3221, *et seq.* (1980 supp.), as:

> a program of instruction, designed for children of limited English proficiency in elementary or secondary schools, in

which, with respect to the years of study to which such program is applicable—(i) There is instruction given in, and study of, English and, to the extent necessary to allow a child to achieve competence in the English language, the native language of the child of limited English proficiency, and such instruction is given with appreciation for the cultural heritage of such children, and of other children in American society, and, with respect to elementary and secondary school instruction shall, to the extent necessary, be in all courses or subjects of study which will allow a child to progress effectively through the educational system. § 3223(a)(4)(A).

It is stipulated that "[b]ilingual-bicultural education is based on the widely recognized premise that the most effective way to teach children who speak a language other than English, the majority language, is through their mother tongue as a vehicle for instruction."[7] Pl.-Int. Ex. 409, # 1115. If the learning process is initiated in English, a language which the child cannot understand, the child will be likely to fail in his subjects in school and suffer permanent damage to his learning potential. Pl.-Int. Ex. 409, # 909. Providing bilingual instruction to Spanish-speaking children with limited proficiency in English enables them to learn reading, mathematics, and other basic cognitive subjects in a language they comprehend at the same time that their skills in English are being developed.

Dr. Courtney Cazden, Professor of Child Development and Language at Harvard University, articulated the concept more fully: "The theory is a very simple one and straightforward one, that children must be taught in a language that they understand, and that is the only possible kind of equal education." TR 114. Dr. Cazden expressed the view that reading, "the foundation of

---

7. The terms "bilingual education" and "bilingual-bicultural education" will be used interchangeably throughout this opinion. As evidenced by the definition found in the "Bilingual Education Act", quoted above, appreciation for the foreign language student's cultural heritage is an inherent part of any comprehensive bilingual program. The parties have stipulated that "[t]he incorporation of the history and culture associated with a student's dominant language into the instructional process is an integral part of bilingual-bicultural education." Pl.-Int. Ex. 409, # 1116.

all future education", must be introduced in the child's native language. TR 115. As she explained:

> [I]f children learn to read in a language that they know, then they are facing one task at that time, namely figuring out the written system; but if a teacher attempts to teach a child to read in an oral language that is not familiar, then the children face the double task of trying to figure out the written system, but even if they figure out and pronounce a word it has no meaning so that is clearly and unequal educational system.

TR 119.

While bilingual education in the earliest grades is necessary to provide Mexican-American children with basic learning skills, its importance does not diminish for students of limited English proficiency in the higher grades. As Dr. Cazden further testified:

> [I]t seems to me the situation at the Grade 4 level and beyond is even more serious, first, because the concepts being dealt with in the older grades get progressively more complicated, and therefore, it's harder to understand them if your knowledge of the language of instruction is limited, and secondly, the instruction itself, as you go through the older grades, * * * gets more completely verbal.

TR 133. Concurrence in this opinion came from Dr. Rudolph Troike, a sociolinguist and the former director of the Center for Applied Linguistics. He asserted that "in some respects it's even more critical that they receive instruction in Spanish [in higher grades], since they are already operating at a level where the cognitive content of the instructional material that's being mediated through the language is much heavier than it is at earlier grade levels." TR 205.

Since bilingual instruction is designed to fill an educational vacuum until a particular child is able to function adequately in an all-English classroom, no single fixed duration for an effective bilingual program exists. The time necessary to learn English varies from student to student, founded on a variety of social factors. Gov. Ex. D7 at 83. The parties stipulated that "[t]hree years of bilingual education is inadequate for many students to achieve the level of proficiency needed to compete effectively in English." Pl.-Int. Ex. 409, # 1121.

Most of the experts who testified at trial proposed functional time limits for bilingual programs based upon the particular progress of each student. Dr. John McFarland, Dean of Education at Texas Women's University, suggested that "[a] student who needs help in two languages should have bilingual education until he is comfortable in both languages, can read in both languages with understanding and comprehension and analytically and can write well in both languages." TR 355. Thus, Dr. Cazden proposed that students be given access to sufficient years of bilingual education at any grade level to function effectively in English language curriculum. TR 172.

The primary alternative to bilingual education for children of limited proficiency in English is the so-called "English as a Second Language" (ESL) program. Children enrolled in ESL programs receive subject matter instruction in English within the regular curriculum. During the course of the school day, these children are taken out of the classroom and given special instruction in the English language. Gov. Ex. B6 at 22. According to Dr. Troike, ESL is essentially a special English class added to the standard school program. TR 202. The principle criticism of ESL as a substitute for bilingual instruction is its failure to provide students speaking foreign languages with meaningful education in cognitive subject areas until after they have learned sufficient English to participate in their regular classes. While a student enrolled in ESL is likely to benefit substantially during the time special English instruction is being provided, the remainder of the school day, spent without comprehension in English-only classes, may be largely wasted. By the time a student's proficiency in English has improved sufficiently to allow for meaningful participation in regu-

lar classes, he has fallen far behind his peers.[8]

### (3) Effectiveness of Compensatory Bilingual Education.

The widespread success of bilingual instruction in meeting the special educational needs of Mexican-American students was amply documented by the evidence presented at trial. Defendants stipulated that the dropout rate for Mexican-Americans in Texas has decreased where bilingual programs have been properly implemented. Pl.-Int. Ex. 409, # 908. A study by the Abernathy Independent School District showed that the test scores of bilingual participants were substantially better than those of a control group of children outside the program. Pl.-Int. Ex. 409, # 1137. James Vasquez, Superintendent of the Edgewood Independent School District, testified that "the attitude of kids toward school has improved tremenduously since the implementation of the bilingual programs in our school—and there is no doubt in my mind that the kids have become more verbal." TR 324. James Lehman, Superintendent of the Eagle Pass Independent School District, reported a "significant growth pattern" at a school in his district attributable to bilingual instruction. TR 405.

These and similar testimonials to the effectiveness of bilingual education in Texas correspond with similar findings made on the national level. Dr. Troike described several recent studies which found that bilingual programs brought Spanish-speaking children "for the first time in recorded history to or above national norms." TR 201.

The United States Commission on Civil Rights, in a comprehensive 1975 report, entitled "A Better Chance to Learn", concluded that "bilingual-bicultural education is the program of instruction which currently offers the best vehicle for large numbers of language minority students who experience language difficulty in our schools." Gov. Ex. B7 at 137.

The record in this case demonstrated the particular psychological benefits of bilingual education to children saddled with a history of discrimination. The United States Commission on Civil Rights reported that the use of the child's native language in daily educational programs counteracts feelings of inferiority and contributes to the development of self-esteem essential for educational development. Id. at 35–36.[9] Dr. Cazden explained that "the status of Spanish in the schools as a whole is a very important statement to the child about how he and his culture are seen in the community." TR 180–91. Dr. Rudolph Troike concluded that teaching a Spanish-speaking child exclusively in English communicates a powerful message to the child that he or she is a second-class citizen. TR 203–205.

Giving credence to the extensive and uncontradicted evidence in this case, it is determined that bilingual instruction is uniquely suited, as a vehicle for compensating Mexican-American children in Texas for learning difficulties engendered by pervasive discrimination. Defendants have failed to demonstrate that any alternative medium of instruction would be equally effective.

---

8. An alternative approach, described by Vidal Trevino, Superintendent of the Laredo Independent School District, as the "cold turkey method", Def. Ex. 95 at 7, involves placing a foreign language student without proficiency in English into a regular English language class, absent special instruction of any kind. None of the testimony at trial indicated that this was a productive or effective educational method. Indeed, the parties stipulated that to expect such children to achieve success in our educational system without making special provision for their language difficulties is an illusion. Pl.-Int. Ex. 409, # 1119.

9. The Commission noted in its report that in the absence of past discrimination or negative socioeconomic conditions, foreign language children could often achieve academic success without bilingual instruction. Id. at 69–74. Conversely, where widespread discrimination has occurred, as is the case with respect to Mexican-Americans in Texas, bilingual instruction serves to remove the sense of inferiority and other learning barriers established by that discrimination and restores equal educational opportunity. Id. at 137–141.

(4) Detailed Description of the State's Remedial Program.

The utility of bilingual instruction in helping students of limited English proficiency to participate successfully in the regular school curriculum is not in dispute in this case. Texas recognized the vital role played by bilingual instruction in enacting the 1973 Bilingual Education Act. Tex.Ed. Code Ann. § 21.451 *et seq.* (Vernon 1980 supp.). Defendants have stipulated to the importance of teaching basic cognitive skills in a child's native language. Pl.-Int. Ex. 409, # 909, 1115. The principle issue which divides the parties is whether the specific program designed and implemented by defendants is adequate to eliminate the vestiges of widespread discrimination against Mexican-Americans described above. In order to resolve that issue, a detailed examination of the state's compensatory education programs must be undertaken.

(a) Program Content.

As noted above, the state of Texas currently mandates bilingual instruction in kindergarten through third grade for children of limited English proficiency,[10] if at least twenty such students sharing a common native language are at the same grade level within a single school district. On paper, the bilingual program to be accorded those students who qualify contains the basic elements set forth in the federal Bilingual Education Act, 20 U.S.C.A. § 3221, *et seq.* (1980 supp.), and explicated in the documentary materials received in evidence. The state's bilingual education statute describes the required program as follows:

(a) The bilingual education program established by a school district shall be a full-time program of instruction (1) in all subjects required by law or by the school district, which shall be given in the native language of the children of limited English speaking ability who are enrolled in the program, and in the English language; (2) in the comprehension, speaking, reading, and writing of the native language of the children of limited English-speaking ability who are enrolled in the program, and in the comprehension, speaking, reading, and writing of the English language; and (3) in the history and culture associated with the native language of the children of limited English-speaking ability who are enrolled in the program, and in the history and culture of the United States.

Tex.Ed.Code Ann. § 21.454 (Vernon 1980 supp.).

Administrative regulations issued by the TEA enumerate the instructional components of the bilingual program:

(1) The basic concepts initiating the child into the school environment are taught in the language he brings from home.

(2) Language development is provided in the child's dominant language.

(3) Language development is provided in the child's second language.

(4) Subject matter and concepts are taught in the child's dominant language.

(5) Subject matter and concepts are taught in the second language of the child.

(6) Specific attention is given to develop in the child a positive identity with his cultural heritage, self-assurance, and confidence.

Pl.-Int. Ex. 383, § 32.52.011. The state's recently-adopted plan for bilingual education thus requires that substantive instruction be provided in both Spanish (the dominant language) and English (the second lan-

---

**10.** The state statute uses the phrase "limited English-speaking ability" to describe those eligible for bilingual education, while the federal Bilingual Education Act employs the term "limited English proficiency". The state itself recognizes that the purpose of bilingual education is to further a child's overall ability to learn in an English-language classroom, not merely to improve oral speech. Limited English "proficiency", which encompasses reading, writing, and understanding the language, in addition to speech, is the more precise term and will be used in lieu of the phrase "limited English speaking ability" throughout the remainder of this opinion.

guage), with the division in time spent on each dependent upon the particular student's relative proficiency in both languages. Gov. Ex. D–13.

Unfortunately, the monitoring conducted by the TEA throughout the state has revealed that these laudable guidelines are frequently ignored by local school districts. A few examples should suffice to demonstrate the wide gap between theory and practice in this field:

- A TEA visit to Lockhart Independent School District in 1975 found that the bilingual program was conducted primarily in English.
- A TEA visit to Aransas Pass Independent School District in 1977 found that no substantive courses within the bilingual program were being taught in Spanish.
- In 1977, the North Forest Independent School District's bilingual program offered no instruction in Spanish language or reading.
- In 1979, the TEA reported that there was no teaching of substantive content in Spanish in the Laredo Independent School District.
- A 1978 TEA monitoring report found very little native language instruction in the Fort Worth Independent School District bilingual program.

Defendants stipulated to the existence of these and similar deficiencies in local bilingual programs in at least twenty-five additional school districts throughout the state. Pl.-Int. Ex. 409, # 801–809, 1207–1234. These districts are failing to provide the minimum level of bilingual instruction required by state law. As a result, many of the state's Mexican-American children entitled to bilingual education are not receiving the compensatory programs they need to keep up with their Anglo counterparts.

(b) Program Coverage.

A far more serious weakness in the state's existing bilingual program is the limited scope of its coverage. Bilingual instruction is required only in kindergarten through grade three, and only in those school districts with twenty or more Spanish-speaking students of limited English proficiency in a single grade. Some state funding is provided for optional bilingual instruction in grades four and five. No state assistance of any kind is available for bilingual programs in grades six through twelve which, as a practical matter, precludes any such programs from being offered in the middle and upper grades.

There was considerable dispute at trial over the exact number of limited English proficiency students in the Texas public education system, but all parties agreed that a large number of these children were not being provided with bilingual instruction under current state policy. A report issued by the TEA in 1979 indicated that 198,613 children of limited English proficiency had been identified, statewide, in grades kindergarten through twelve, of whom 89,600 (about forty percent) were not in bilingual programs. Pl.-Int. Ex. 406. Fewer than half of the 19,622 identified children of limited English proficiency in grades four and five (where bilingual instruction is optional) were enrolled in such programs. In grades six through twelve, none of the 64,622 limited English proficiency students identified by TEA were receiving bilingual instruction. In 1975, fifty-seven school districts with a majority of Spanish-speaking, limited English proficiency children in their student populations provided no bilingual instruction, since there were no more than twenty such students in any one grade. Pl.-Int. Ex. 409, # 338.

The number of limited English proficiency students reported by TEA was probably an underestimation, because of the deficiencies in the state's procedures for identifying such children, described in detail below. Figures reported by Dr. James O'Malley, Senior Research Associate at the National Institute for Education, were considerably higher. On the basis of a recent sampling, Dr. O'Malley estimated that there were 438,000 children in Texas of limited English proficiency between the ages of five and fourteen, inclusive. TR 504. The vast majority of these children are Mexican-Ameri-

can. The state itself projects a Hispanic enrollment in the public schools of 941,875 by 1983–84. If, as Dr. O'Malley suggests, some seventy percent of these children will be limited in English proficiency, approximately 660,000 Mexican-American children will be in need of compensatory education. Projecting forward the fact that approximately forty percent of limited English proficiency students are excluded from bilingual programs under current state policy, it can be estimated that 264,000 limited English proficiency Mexican-American students will be without bilingual instruction within the next three years, unless changes are made.

Defendants maintained at trial that their policy of requiring bilingual instruction in grades kindergarten through three in those districts containing large numbers of Spanish-speaking students, with optional programs at local discretion in grades four and five, was adequate to meet compensatory educational needs. While conceding that bilingual education for all children in all grades would be desirable in an ideal world, defendants pointed to budgetary constraints and limited availability of bilingual staff as necessitating a more modest approach. The state's new bilingual education plan endeavors to pick up the slack by requiring an English language development program to be provided to all limited English proficiency students in the Texas public schools who are not receiving bilingual instruction. Pl.-Int. Ex. 383, § 32.52.012.

But the extensive expert testimony offered at trial demonstrated that bilingual education must be provided for children unable to learn in English, until each child is capable of making the transition to a regular, English language classroom, if learning disabilities borne out of pervasive historical discrimination are ever to be overcome. Dr. Cazden, observed: "It is essential that a full plan be available K through twelve for those children who need it." TR 162. Dr. Angel Gonzales, Director of Bilingual Education for the Dallas Independent School District, agreed, TR 275–76, as did Dr. Mary Galvan, Member of a TEA Bilingual Task Force. TR 697. James Lehman,

Superintendent of Schools for the Eagle Pass Independent School District, testified to a tremendous need for bilingual education in grades seven through twelve. TR 402. None of this testimony was contradicted or refuted.

The rationale for requiring a bilingual program of some description at all grade levels, as noted above, derives from the fact that the period of time needed to develop sufficient proficiency in English varies from child to child. *See supra* at 419. Defendants likewise did not dispute that fact. As already stated, they conceded that three years of bilingual instruction, as required by current state law, is inadequate for many students to achieve the level of competence needed to compete effectively in English. Pl.-Int. Ex. 409, # 1121.

Moreover, thousands of limited English proficiency children in the Texas public school system never receive any bilingual instruction whatever. As pointed out by the defendants' own witness, Dr. Robert Tipton of the TEA Division of Bilingual Education, many foreign language-speaking children initially enroll in the Texas public schools at different ages and at different intervals in the school year, depending upon when they first enter the state. TR 1163. Under current state policy, a Mexican-American child with no knowledge of English who enters a Texas school in the sixth or a higher grade is necessarily thrown into an all-English classroom, without the benefit of bilingual instruction. Similarly, limited English proficiency students who happen to reside in smaller school districts, with no more than twenty such students in any single grade, receive no bilingual instruction under existing programs.

The state's attempt to rectify these deficiencies by providing an English language development or ESL program in lieu of bilingual instruction is wholly inadequate. As Dr. Galvan testified, an ESL program is ineffective where it is implemented outside the context of a bilingual program. TR 733–34. As already mentioned, children enrolled in such programs cannot fully com-

prehend the material being taught in the English language classroom they remain in during most of the school day. During the time they are absent from their regular classroom for special instruction in English, their classmates are moving ahead with substantive instruction. Thus, each day the Mexican-American children participate in this makeshift English language development program, they fall further and further behind their classmates in mathematics, science, social studies, and the other subjects they must master in order to progress. When these students fall so far behind that they cannot compensate for the time lost, or gain upon their peers, they either give up and drop out of school or hopelessly struggle on, effectively disabled by the Texas education system. While the ESL program, examined in a vacuum, might appear to contribute more educational benefit than harm, its incongruity with the remainder of the school curriculum renders it inadequate in meeting the special needs of Mexican-American students at all grade levels of the state's public schools.

(c) Identification of Limited English Proficiency Students.

In order to qualify for remedial assistance as described above, a child must first be identified as having limited proficiency in English. Bilingual instruction and ESL are not provided to all Spanish-speaking students, but only to those who are expected to have difficulty learning in an all-English classroom. The accuracy of this initial assessment mechanism is vital to ensuring that special help is provided to those children who need it.

Defendants stipulated at trial that each local school district employs its own procedures to identify children of limited English proficiency. Pl.-Int. Ex. 409, # 213. The methods used are never validated by TEA or any other state agency. Pl.-Int. Ex. 409, # 206. The accuracy of student counts carried out by the local school districts are likewise not verified. Pl.-Int. Ex. 409, # 407, 428; Pl.-Int. Ex. 434 at 25; Gov. Ex. A–7 at 42.

Monitoring reports by TEA indicate that numerous school districts have identified limited English proficiency students solely by the subjective opinions of teachers. Pl.-Int. Ex. 409, # 215, 216, 220, 222, 223. In districts which employ testing mechanisms to measure English language proficiency, Spanish-surnamed students may be the only ones tested. Yet the defendants conceded that Spanish surname is not an accurate indicator for identifying students in need of remedial instruction. Pl.-Int. Ex. 409, # 202. Children are present in Texas schools with Anglo surnames who are, in fact, Spanish-speaking. Gov. Ex. A–9, at 21. It is manifest that such students, who may have limited proficiency in English, should not be overlooked during the identification process.

The new Texas State Plan for Bilingual Education contains guidelines which would improve the accuracy of identifying limited English proficiency students throughout the state. Gov. Ex. D–13. The plan requires that, upon registration for school, all students with foreign surnames receive a "home language" survey, to determine whether the child has a native language other than English. The survey is also to be distributed to other children, based upon staff observation or parental interview. Gov. Ex. D–13 at 1. All students who return a survey form indicating a home language other than English are to be administered an English language proficiency test. The students' scores on that test are compared with fixed standards, to ascertain whether they will be classified as having limited proficiency in English and treated accordingly.

This standardized identification technique, if actually implemented throughout the state, will be far better than the *ad hoc*, unregulated procedures employed to date. But the method is far from perfect, for all students should be administered a home language survey when they first enter the Texas public schools, to ensure that no foreign language students are overlooked at this key stage. The language proficiency tests approved by TEA under its new plan

do not meet commonly accepted standards for educational testing and are not necessarily suitable for use at all grade levels. Def. Ex. 68 at 63, 74–76. Classification of individual students as proficient or not proficient in English varies considerably depending upon the particular test utilized. Def. Ex. 94, Ex. A at 23–24. Moreover, testing alone is often insufficient to measure English proficiency accurately. Some confirmation of test results by teacher observation is needed, before a Spanish-speaking student should be declared ineligible for bilingual instruction or other remedial programs. Def. Ex. 68 at 64–65. Finally, the evidence previously alluded to makes it evident that the identification of limited English proficiency students by local school districts should be verified by TEA through on-site monitoring.

#### (d) Exit Criteria.

One of the principal subjects at issue in this case is the validity of the criteria employed by the defendants for removing students from bilingual programs and reclassifying them for entry into regular classes conducted exclusively in English. Such criteria were adopted pursuant to the State's Bilingual Education Act, which prohibits the transfer of a student out of a bilingual program prior to the third year of enrollment "unless the parents of the child approve the transfer in writing and unless the child has received a score on an examination which, in the determination of the agency, reflects a level of English skills appropriate to his or her grade level." Tex. Ed.Code Ann. § 21.455 (Vernon 1980 supp.).

Since bilingual education in Texas is a transitional program, designed to provide students with the tools they need to function effectively in a classroom taught only in English, some threshold criteria for making that shift must be established. The parties disagree over what particular level of proficiency in English must be reached before a child no longer needs bilingual instruction or other remedial assistance. In 1976, the TEA issued a memorandum stating that transfer from a bilingual program would be permitted only if a student received a composite score at or above the fortieth percentile on the language arts and reading sections of an approved standardized achievement test.[11] Pl.-Int. Ex. 260. The memorandum specified that:

> The 40th percentile [was] chosen because the Texas Education Agency [felt] that a child whose primary language is other than English should be able to demonstrate English proficiency to an extent that his integration into and participation in the regular school program will in no way be jeopardized by a deficiency in English language skills.

*Id.* But the revised state plan, approved less than three years later, sharply reduced the level of proficiency which justifies reclassification. Under current TEA regulations, a student can be withdrawn from a bilingual program and transferred into an all-English classroom as soon as the student achieves a score at the twenty-third percentile or higher in reading and language arts on an approved test. Gov. Ex. D–13 at 13. Thus, even if three-fourths of the nation's students perform better than a particular Mexican-American child in these subjects, that child is now deemed by the state to be adequately equipped to learn effectively without remedial help in an English language classroom. Moreover, there is no indication that the relative abilities of each particular student in Spanish and English are compared during the reclassification process.

---

11. The significance of percentile scores on standardized tests obviously depends upon the test population to which a particular student is being compared. The approved tests specified by the TEA as exit criteria are national in scope of administration. Documentary evidence indicates that the threshold percentile scores adopted referred to a statistical comparison with all students taking the test throughout the United States. Alternatively, the TEA could have employed a relative scale based upon scores achieved by students in Texas or by Anglo students nationwide or by any other particular subset of the overall national student population. Such a change in the base population would necessarily alter the significance of a particular percentile score.

The testimony of expert witnesses was harshly critical of the twenty-third percent threshold. James Lehman, Superintendent of Schools in the Eagle Pass Independent School District, observed: "I would have to say that a student scoring at the 23rd precentile within Eagle Pass Independent School District would probably be identified as a student requiring additional remedial assistance, not a student who is capable of being able to hold his own and be able to achieve academically." TR 406. Dr. Robert Cervantes, Assistant Chief of the Office of Bilingual Education for the State of California, described the level as "ludicrous", adding that students scoring at the twenty-third percentile were "functionally illiterate." TR 560. Dr. Jose Cardenas, one of the nation's leading experts in the field of bilingual education, called the twenty-third percent level "insultingly low." TR 766. Dr. Mary Galvan referred to the criterion as "wholly inadequate." TR 694. That evaluation was shared by Angel Gonzales, Director of Bilingual Education for the Dallas Independent School District. TR 225. Dr. John McFarland, Dean of Education at Texas Women's University, noted: "A person functioning at the 23rd percentile would be ineffective in our society in salesmanship, in merchandising, or in any profession or in seeking opportunities or, indeed, might be handicapped in his interpersonal relationship with others." TR 357.

There is no doubt that the current state regulations, which tie reclassification solely to an achievement test score of twenty-third percentile or higher, are wholly inadequate to meet the needs of the state's Mexican-American children. That figure is arbitrary and unjustifiably low. A state policy which takes children in need of remedial programs out of those very programs satisfies no legitimate purpose. Once a child has been identified as limited in English proficiency, it appears logical that the presumption should obtain that remedial help is required until there is persuasive evidence that the child is indeed ready to move into an all-English classroom. As one expert witness explained, the criteria for exit should err on the side of leaving some students in bilingual programs longer than absolutely necessary, rather than removing some prematurely. In this connection, Dr. Martin Gerry, former Director of the Office of Civil Rights at the Department of Health, Education and Welfare, testified: "It doesn't hurt a child to receive specialized intensive services even beyond some point in time when you could argue that the child doesn't need it, but it devastates a child to be taken out of a program of specialized intensive services when the child does need it." TR 948.

While maintaining that the test score threshold is set too low to signify actual proficiency in English, many of the expert witnesses who testified also criticized the defendants' exclusive reliance upon standardized written test results to resolve whether a child was ready to move into an all-English classroom. Oral speaking ability, essential to effective class participation, is not measured by the TEA-approved tests. TR 407. The defendants' own witness, Dr. Robert Tipton of TEA, conceded that oral speaking ability will not correlate with achievement test scores as a matter of course. TR 1258. Thus, current state exit criteria fail to address the child's ability to function fully in an English-speaking class.

The preponderance of expert testimony, including that offered by defendants, indicated that exit criteria should be multi-faceted in nature, to ensure that a student is not prematurely excluded from a bilingual program which may be essential for educational success. Dr. Cardenas suggested that the achievement test score, oral proficiency, teacher judgment, and parental viewpoint should all be taken into account in making a decision to reclassify a limited English proficiency child. TR 1126–27. Dr. Tipton recommended that the mastery of specific skills, reflecting all facets of the learning process, replaces test scores altogether as exit criteria. TR 1203.

In sum, the record demonstrates that the state's exclusive reliance upon English achievement test scores for the purpose of reclassifying students out of bilingual programs is erroneous. All of the testimony

indicated that oral speaking ability and other cognitive skills must be taken into account as well. Moreover, the relative abilities of a student in Spanish and English are relevant to determining whether that student can achieve his learning potential in an English-only classroom. Multi-faceted criteria should be developed to carry out this important task of reclassification in an accurate and responsible manner.

### (e) Monitoring and Enforcement.

The inadequacies of the state's bilingual program, described above, are compounded by the defendants' failure to monitor and enforce local compliance with state regulations in this field. Primary responsibility for state administration of bilingual education rests with TEA's Division of Bilingual Education. The myriad duties of this division include advising school districts concerning the development and implementation of local programs, reviewing local proposals for Title VI grants, reviewing all applications for state bilingual funding, and monitoring local compliance with state law. The division currently employs ten professionals and two secretaries to carry out these tasks, with respect to approximately 1,100 school districts throughout the state. No increase in personnel or resources is contemplated by TEA. Pl.-Int. Ex. 409, # 401, 404.

It is clear that the staffing of the Bilingual Education Division is grossly inadequate to accomplish all of its responsibilities. By its own estimate, the division could not fulfill its basic duties, even with an increase in personnel of fifty percent. Pl.-Int. Ex. 409, # 444. Attributable in part to this severe staffing constraint, the division has concentrated on providing technical assistance to school districts, rather than monitoring compliance with state law. Gov. Ex. A–7 at 52.

The Division of Bilingual Education does, however, accomplish on-site visits of selected school districts to evaluate their bilingual programs. Up to the time of trial, monitoring had been limited to those districts reporting a sufficient number of limited English proficiency students to necessitate bilingual instruction. By undercounting such students—and failing to establish a bilingual program to meet their needs—, a local school district could thus effectively avoid compliance review.

The principle tool used in conducting these visits is TEA's *Guide for Monitoring Visit*, a publication which defendants admit is inadequate for its intended purpose. Pl.-Int. Ex. 409, # 461, 452. Following a monitoring visit, the division sends a report of its findings to the school district, specifying any criticisms or weaknesses in the district's program. But the division does not threaten or impose sanctions for non-compliance, nor has it ever recommended to the Division of School Accreditation that sanctions be imposed. Pl.-Int. Ex. 409, # 417.

The Division of School Accreditation is the second principal actor in the defendants' enforcement program. That division has the power to impose sanctions, up to and including loss of state accreditation, upon local districts which violate state education laws and regulations. The record indicates that this division has not treated the state's Bilingual Education Act as worthy of strict enforcement. Despite serious deficiencies and violations of law found in the bilingual programs of numerous local districts and reported to the Division of School Accreditation, no warnings or sanctions of any kind have been imposed. Pl.-Int. Ex. 409, # 441. Similarly, no school district in Texas has ever faced a loss of accreditation for failing to provide bilingual education altogether. *Id.,* # 403.

In keeping with its lax enforcement policies in this area, TEA significantly diluted formal accreditation standards regarding bilingual education in 1977. The original bilingual guidelines, which were embodied in the accreditation standards, set forth specific program requirements which included program content and teaching methodology. Pl.-Int. Ex. 68 at 19. But three years later, the agency rewrote Principle VI, Standard 8, in the following vague terms: "A district enrolling pupil populations requiring compensatory programs discharges those obli-

gations by adaptations of the curriculum to fit distinctive needs (such as language or culture) of these populations." Pl.-Int. Ex. 409, # 407(a), 408(a); Pl.-Int. Ex. 69 at 23.

The new state plan for bilingual education does address some of the deficiences of TEA's compliance program. The plan provides for on-site visits to school districts without bilingual programs, as well as to those districts where such programs do exist. Pl.-Int. Ex. 383, § 32.52.050. The plan further provides that the Division of Bilingual Education shall report the findings of its monitoring visits to the Division of School Accreditation. *Id.* But unless some appropriate division within TEA undertakes on-site verification of student counts reported by districts without bilingual programs, visiting such districts is largely an empty gesture. Moreover, no indication is present that the Division of School Accreditation will give any more emphasis to information concerning shortcomings in the area of bilingual education than it has in the past. Finally, while augmenting the monitoring duties of the Bilingual Education Division may appear hypothetically impressive, these new responsibilities cannot, in reality, be effectively undertaken by the same tiny staff unable to complete a more modest set of tasks up to the present. Unless the defendants are prepared to commit substantial additional resources to this effort, monitoring of bilingual education at the local level will continue to be deficient.

(5) Conclusion.

■ The state's compensatory education program has not succeeded in eradicating the disabling effects of pervasive historical discrimination suffered by Mexican-Americans in the field of education. Bilingual instruction is uniquely suited to remedying the special learning problems of these children and preparing them to enjoy equal educational opportunity in the Texas public schools. The state's existing bilingual program, while an improvement over past practices, is wholly inadequate.

Serious flaws permeate every aspect of the state's effort. Required program content, described in detail by state law and regulation, is frequently ignored by local school districts. The scanty coverage of the state's bilingual program leaves tens of thousands of Mexican-American children without the compensatory help they require to function effectively as students. Identification of limited English proficiency students by local school districts is unreliable and unverified. Criteria for transferring students out of bilingual programs and into all-English classrooms are fixed far too low to ensure that all vestiges of discrimination have been removed before relief is cut off. Finally, the state has failed to monitor local bilingual programs in a thorough and diligent manner or to enforce applicable laws and regulations through the imposition of sanctions in appropriate circumstances. Since the defendants have not remedied these serious deficiencies, meaningful relief for the victims of unlawful discrimination must be instituted by court decree.

III. TITLE VI CLAIM.

In addition to their constitutional claims based upon *de jure* discrimination against Mexican-Americans in Texas, plaintiffs contend that they are entitled to relief under two separate federal statutes.[12] The first

---

12. Plaintiffs do not assert an independent constitutional right to intelligible instruction outside the context of past *de jure* discrimination. Such a claim would necessarily require a confrontation with the crucial question left unanswered by the Supreme Court in *San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). In *Rodriguez*, the Court held that mere discrepancies in the amount of funding provided for public education did not infringe upon any fundamental constitutional right. *Id.* at 36–37, 93 S.Ct. at 1298-1299. But the Court left open the possibility that an absolute denial of educational opportunity could constitute, in itself, a denial of equal protection subject to strict scrutiny. *Id.* See also *Doe v. Plyler*, 628 F.2d 448, 456–57 (5th Cir. 1980); *Fialkowski v. Shapp*, 405 F.Supp. 946, 958 (E.D.Pa.1975) (holding absolute deprivation of education unconstitutional). Moreover, even in the wake of *Rodriguez*, a minimum quantum of education may be constitutionally protected as a necessary prerequisite to the exercise of other constitutional rights.

In *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), discussed below, the Su-

such statute, section 601, of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. 2000d, prohibits discrimination in any program receiving federal funds.[13] The crux of the statutory claim is that the defendants' failure to provide adequate educational programs to remedy the special learning difficulties of these children constitutes, in itself, unlawful discrimination based on national origin. For the reasons set forth below, plaintiffs have not prevailed on this cause of action.

Plaintiffs' Title VI allegations parallel the claim upheld by the Supreme Court in *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). *Lau* was a class action brought on behalf of non-English speaking Chinese students in San Francisco. Plaintiffs claimed that the failure of the city's public school system to educate these children in a language they could understand constituted discrimination in violation of both Title VI and the Equal Protection Clause of the Fourteenth Amendment. In a brief opinion, limited to the statutory claim, the Court declared that providing the same all-English instruction and materials to students who speak English and to those who did not constituted inequality of educational opportunity, since the latter "are effectively foreclosed from any meaningful education." *Id.* at 566, 94 S.Ct. at 788. Relying upon regulations of the Department of Health, Education and Welfare which were drawn up to interpret and administer Title VI, the Court found that "discrimination is barred [under the statute] which has that *effect* [discrimination], even though no purposeful design is present." *Id.* at 569, 94 S.Ct. at 789 (em-

phasis in original). Once unlawful discrimination had been established, the regulations required that school authorities take affirmative action to rectify the language barrier impeding these students. The Court remanded the case for a determination of the proper remedy in accordance with those regulations.

The apparent significance of *Lau* to the case at bar is clear. First, *Lau* demonstrated the Supreme Court's concern with language barriers linked to ethnicity and its awareness that such barriers, unless overcome, effectively preclude educational opportunity. Second, *Lau* recognized an affirmative obligation on the part of school officials to take steps to meet this problem head-on. Third, and most importantly, *Lau* was predicated on the Court's stated assumption that only discriminatory effect was necessary to establish unlawful action under Title VI. Discriminatory purpose or intent, under that view, need not be demonstrated as an essential element of the statutory violation.

It is on this final point that plaintiffs' Title VI claim founders in this case. In 1976, two years after it decided *Lau*, the Supreme Court held that an allegation of discriminatory purpose, in addition to discriminatory impact, was necessary to state a cause of action under the Fourteenth Amendment. *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597. According to this newly-evolved doctrine, "[e]ven if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact

---

preme Court observed that students who do not understand English and are placed in all-English classrooms "are certain to find their classroom experiences *wholly* incomprehensible and *in no way* meaningful." *Id.* at 566, 94 S.Ct. at 788 (emphasis added). Such students, the Court found, "are effectively foreclosed from *any* meaningful education." *Id.* (emphasis added). Thus it could be argued that the defendants' failure to provide appropriate remedial instruction to Spanish-speaking children constitutes, in effect, an absolute deprivation of education, impinging upon a fundamental right and triggering strict scrutiny under the Equal

Protection Clause of the Fourteenth Amendment. In light of the parties' failure to raise this claim, and also giving consideration to the disposition of the remainder of the case, no effort will be made to decide this important question or to address it in greater detail.

**13.** The text of the statute is as follows:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

can be traced to a discriminatory purpose." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979).

The infusion of an intent requirement into the constitutional cause of action did not necessarily alter the parameters of Title VI. Congress is empowered to proscribe discriminatory conduct which the Constitution does not reach, as it has, for example, in enacting Title VII, which imposed duties on private employers beyond the scope of the Fifth and Fourteenth Amendments. But in the case of *University of California Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), a majority of the Court, in separate opinions, addressed the relationship between Title VI and the Equal Protection Clause and found them to be essentially coextensive.

Four members of the Court, in an opinion written by Justice Brennan, undertook an extensive analysis of the legislative history of Title VI. They concluded that "Title VI prohibits only those uses of racial criteria that would violate the Fourteenth Amendment if employed by a state or its agencies. . . ." *Id.* at 328, 98 S.Ct. at 2767. The purpose of the statute, these justices found, was not to expand the concept of discrimination under the law, but rather to extend the existing requirements of the Fourteenth Amendment to private programs that receive federal funds. *Id.* at 327–29, 98 S.Ct. at 2767–68.

Justice Brennan and his colleagues were well aware that their views concerning Title VI, when read in conjunction with *Washington v. Davis* and its progeny, undercut the doctrine set forth in *Lau, i. e.,* that impact alone was sufficient to make out a statutory violation. Their analysis was expressed in the following passage:

We recognize that *Lau,* especially when read in light of our subsequent decision in *Washington v. Davis,* 426 U.S. 229 [96 S.Ct. 2040, 48 L.Ed.2d 597] (1976), which rejected the general proposition that governmental action is unconstitutional solely because it has a racially disproportionate impact, may be read as being predi-

cated upon the view that, at least under some circumstances, Title VI proscribes conduct which might not be prohibited by the Constitution. Since we are now of the opinion, for the reasons set forth above, that Title VI's standard, applicable alike to public and private recipients of federal funds, is no broader than the Constitution's, we have serious doubts concerning the correctness of what appears to be the premise of that decision. *Id.* at 352, 98 S.Ct. at 2779. The four justices nevertheless concluded that "Title VI's definition of racial discrimination is absolutely coextensive with the Constitution. . . ." *Id.*

This view was shared by a fifth member of the Court, Justice Powell, who also reviewed legislative history and declared: "In view of the clear legislative intent, Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *Id.* at 287, 98 S.Ct. at 2746. The four remaining justices, speaking through Justice Stevens, found it unnecessary to decide the congruence, or the lack thereof, between Title VI and the Fourteenth Amendment in order to decide the case. *Id.* at 417–18, 98 S.Ct. at 2813.

The United States, recognizing the implications of *Bakke* for its *Lau*-based statutory claim in this case, has attempted to distinguish those two cases in a manner which would justify the conclusion that the majority of justices did not accurately express what they mean to signify. Relying upon a description of *Lau* offered by Justice Powell, the Government asserts that Title VI is coextensive with the Fourteenth Amendment in some circumstances (*i. e., Bakke*) but not in others (*i. e., Lau*). It is quite true that the affirmative action disallowed in *Bakke* was substantially different from the affirmative action mandated in *Lau.* But the majority's finding of coextensiveness, based upon overwhelming evidence of congressional intent, did not depend upon the details of each alleged act of discrimination. Either Congress went beyond the constitutional notion of unlawful discrimi-

nation in enacting Title VI or it did not. A majority of the Supreme Court has concluded that it did not.

█ Thus, while *Bakke* does not expressly overrule *Lau*, it renders that decision obsolete, insofar as it found a violation of Title VI merely on proof of discriminatory impact without any showing of discriminatory intent, as required by *Washington v. Davis* and subsequent cases. If Title VI is coextensive with the Equal Protection Clause, purposeful discrimination must be shown to make out a statutory violation.[14] Thus it must be decided whether that required has been met by plaintiffs here.

█ Proof of discriminatory intent necessitates a showing that the defendants acted as they did for the purpose, in whole or in part, of mistreating or relegating members of a particular racial or ethnic group to an inferior position. In this case, the State of Texas and its educational agencies have taken certain steps, for the purpose of alleviating language barriers which pose an obstacle to the education of Spanish-speaking children. While these actions have been inadequate to meet the problem, it has not been suggested that they were instituted for an invidious purpose.

█ It is unquestionable that the defendants' refusal to provide bilingual instruction at all grade levels for all children of limited English proficiency has effected a disproportionate impact upon the state's Mexican-American ethnic minority. But there is no evidence that the state's recent policies, isolated from the long history of purposeful discrimination, were themselves designed with the intent of perpetuating that discrimination. The state's existing program of remedial instruction for these disadvantaged children may be inadequate, but it is not, in itself, discriminatory. In the absence of purposeful discrimination, the state's failure to provide comprehensive bilingual instruction for all Mexican-American students who need it ·does not, apart

from the past *de jure* discrimination suffered by that ethnic group, constitute an independent violation of the Equal Protection Clause. Since Title VI has now been deemed coextensive with the Fourteenth Amendment, neither has there been a violation of that statute.

## IV. EQUAL EDUCATIONAL OPPORTUNITIES ACT CLAIM.

The second statutory basis of plaintiffs' claim for relief is § 204(f) of the Equal Educational Opportunities Act of 1974 (E.E.O.A.), codified at 20 U.S.C. § 1703(f). The E.E.O.A., enacted as Title II of the Education Amendments of 1974, was originally proposed by the President in 1972, when it passed the House but not the Senate. Two years later, the E.E.O.A. was adopted as a floor amendment to the omnibus Education Amendments legislation in both houses of the Congress and signed into law. Section 1703 of the statute prohibits a state from denying equal educational opportunity in any of six specified ways, including

> the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional program.

§ 1703(f). Plaintiffs contend that the defendants' existing educational program, which has failed to overcome the language barrier faced by Mexican-American children, violates this provision of law.

In assessing the validity of that claim, it is necessary, first, to address the same question discussed above—the relationship of the E.E.O.A. to the Fourteenth Amendment. If § 1703 merely restates the requirements of the Equal Protection Clause, without creating new forms of prohibited conduct, the entire body of Fourteenth Amendment law, including the intent requirement set forth in *Washington v. Davis*, should presumably be read into the statute. But if the E.E.O.A., like Title VII, was designed to proscribe discriminatory action

---

**14.** This conclusion is not affected by *Serna v. Portales Municipal Schools*, 499 F.2d 1147 (10th Cir. 1974), *Lora v. Board of Education of* *the City of New York*, 456 F.Supp. 1211 (E.D.N.Y.1978), or any other Title VI cases decided prior to the Court's decision in *Bakke*.

outside the scope of the constitutional prohibition, it must be accorded a separate interpretation on the basis of its own language and legislative history.

■ The evolution of the E.E.O.A. makes it clear that the statute was intended to create new substantive rights for victims of discrimination, beyond that subject to challenge on constitutional grounds. The House Committee on Education and Labor, which approved the legislation in 1972, reported:

> [t]he committee bill for the first time in Federal Law contains an illustrative definition of denial of equal educational opportunity. It is the purpose of that definition... to provide school and governmental authorities with a clear delineation of their responsibilities to their students and employees and to provide the students and employees with the means to achieve enforcement of their rights.

H.R.Rep.No. 1335, 92nd Cong., 2nd Sess. at 3 (1972).

The presidential message which proposed the legislation specifically emphasized its establishment of enforceable rights for school children of limited English proficiency:

> School authorities must take appropriate action to overcome whatever language barriers might exist, in order to enable all students to participate equally in educational programs. This would establish, in effect, an educational bill of rights for Mexican-Americans, Puerto Ricans, Indians, and others who start under language handicaps, and ensure at last that they too would have equal opportunity.

118 *Congressional Record* 8931 (1972).

The Court of Appeals for the Fifth Circuit has recognized that the E.E.O.A. in general and section 1703(f) in particular encompass forms of conduct not within the purview of the Equal Protection Clause. In *United States v. Hinds County School Board*, 560 F.2d 619 (1977), the Court of Appeals expressly rejected the defendant's assertion that the legislation merely restates existing constitutional law and, to the contrary, held:

> The sections go beyond the acts and practices proscribed prior to the Equal Education Opportunities Act's passage and guarantee additional rights to public school children.

*Id.* at 624. In *Morales v. Shannon*, 5 Cir., 516 F.2d 411, 415 (1975), *cert. denied* 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1976), a desegregation case brought on behalf of Mexican-American children in Uvalde, Texas, the court observed:

> It is now an unlawful educational practice to fail to take appropriate action to overcome language barriers.

Section 1703(f) was cited as authority for this statement of law.

The above analysis demonstrates that the E.E.O.A., in contrast to Title VI, is not coextensive with the Fourteenth Amendment. The question of whether or not discriminatory intent is a necessary element of a § 1703(f) violation must therefore be resolved, not by reference to constitutional doctrine, but by the text of the statute itself. The language and structure of § 1703 provide a clear answer. Six different means by which equal educational opportunity may be denied are enumerated. Several of these forbidden forms of conduct, as described in the subsections of § 1703, expressly include an element of intent. Sections 1703(a) and (b) address instances of "deliberate segregation", while § 1703(e) prohibits student transfers "if the purpose and effect of such transfer is to increase segregation...."

■ In contrast, other subsections of § 1703 contain no requirement of intent in describing prohibited conduct. Section 1703(c) is concerned with all student assignments which have the *effect* of increasing segregation. Similarly, § 1703(f), the provision at issue here, says nothing about purpose. Thus, the subsection applies to any failure by any educational agency to overcome language barriers, regardless of how the barrier originated or why the agency has neglected to take corrective measures.

Plaintiffs allege that defendants have failed to take appropriate remedial action

to meet the language difficulties encountered by Spanish-speaking students in the public schools. That allegation falls directly within the terms of § 1703(f). Hence, no proof of invidious intent need be presented. Congress has determined that a school system which fails to overcome language barriers that handicap its students denies them equal educational opportunity. If plaintiffs can demonstrate such failure, whether deliberate or unintentional in nature, they are entitled to relief.

██ One remaining question in deciding whether a violation of the E.E.O.A. has taken place lies in the meaning of the phrase "appropriate action" in § 1703(f). If the statute requires only that school officials take some steps to address the problem posed by language barriers, that requirement has certainly been met by defendants here. They have instituted a plan, described above, consisting of bilingual instruction for some students and English development classwork for others. While the deficiencies of that program are manifest, it is, nevertheless, a program of action undertaken to meet the perceived need.

██ But it would make little sense to conclude that Congress, after identifying a serious problem in the nation's schools and requiring affirmative measures to overcome it, would permit any course of conduct, however ineffectual or counter-productive, to satisfy its mandate. Congress was obviously concerned with the implementation of effective solutions to learning barriers caused by language differences, not with forcing school officials to go through the motions of responding to the statutory mandate without achieving meaningful results. The term "appropriate action" must necessarily include only those measures which will actually overcome the problem. Substantive results, not form, are necessarily dispositive in assessing a school district's compliance with the law.

In two recent cases involving claims relating to bilingual instruction, this interpretation was accorded § 1703(f) by the United States District Court for the Eastern District of New York. *Rios v. Read*, 480 F.Supp. 14 (1978); *Cintron v. Brentwood Union Free School District*, D.C., 455 F.Supp. 57 (1978). In each case, it was found that the school district's programs, while well-intended, were inadequate; and it was concluded and ordered that more effective programs should be instituted to meet the requirements of the statute. *See also Rios v. Read*, 73 F.R.D. 589, 596 (E.D.N.Y.1977) (discussing these issues in pretrial context). Plaintiffs contend for a similar finding in the case at bar.

One court addressing a claim brought under this statute found that "appropriate action" under § 1703(f) need not include bilingual instruction. *Guadalupe Org. Inc. v. Tempe Elem. School*, 587 F.2d 1022, 1030 (9th Cir. 1978). There, the Court of Appeals for the Ninth Circuit upheld a local district's remedial plan against a challenge brought on behalf of Spanish-speaking children. But plaintiffs in *Guadalupe*, in sharp contrast to plaintiffs here, conceded that the plan already in place was adequate to enable the students to participate fully in the educational process. *Id.* at 1028–29. They sought bilingual instruction, not as a transitional device to prepare children to enter an all-English classroom, but as a permanent educational end in itself.

It is true that bilingual instruction *per se* is not required by § 1703(f) or any other provision of law. If the defendants here had implemented another type of program which effectively overcame the language barriers of Mexican-American students and enabled them to participate equally in the school curriculum, without using bilingual instruction of any kind, such a course would constitute "appropriate action" and preclude statutory relief. But the evidence in this case, discussed above, showed that the defendants have failed to remedy this serious educational problem as it exists throughout the State of Texas. A violation of § 1703(f) has thus occurred. The evidence also demonstrated that bilingual instruction is uniquely suited to meet the needs of the state's Spanish-speaking students. Therefore, the defendants will be required to take further steps, including

additional bilingual instruction, if needed, to satisfy their affirmative obligation under the statute and enforce the right of these linguistically deprived children to equal educational opportunity.

■■■■ A separate violation of the E.E.O.A. by the defendants stems directly from their failure to remove the disabling vestiges of past *de jure* discrimination against Mexican-Americans as found in section II, *supra.* Under § 1703(b) of the E.E.O.A., equal educational opportunity is denied where an educational agency which has formerly practiced deliberate segregation of students on the basis of race, color, or national origin fails to take "affirmative steps" to remove the vestiges of that discrimination. As in the case of "appropriate action" under § 1703(f), the affirmative steps required by § 1703(b) are necessarily those measures which accomplish the objective of completely extirpating discrimination. The myriad deficiencies of the defendants' existing educational program for Mexican-American students make out a statutory offense under § 1703(b), as well as a violation of the Equal Protection Clause.

## V. RELIEF.

The lingering residue of unconstitutional discrimination suffered by Mexican-Americans in Texas and the continued existence of language barriers which impede equal educational opportunity can no longer be tolerated. The defendants make much of their efforts to meet these inequities and bring Mexican-American children into the educational mainstream. It is true that the state's existing policies toward these children constitute a significant improvement over past *de jure* discriminatory practices and are no doubt motivated by the best of intentions. But good intentions are not enough. The measure of a remedy is its effectiveness, not its purpose. *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (*Dayton II*). The Court of Appeals for the Fifth Circuit succinctly expressed this proposition:

As the Constitution dictates, the proof of the pudding is in the eating: the proof of a school board's compliance with constitutional standards is the result—the performance.

*United States v. Jefferson Cty. Bd. of Ed.,* 372 F.2d 836, 894 (1966), *cert. denied* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

The task of enabling all Mexican-American children in Texas to overcome past discrimination and enjoy full participation in the state's public education system cannot be delayed until the defendants voluntarily overcome their reluctance to provide the necessary programs. Constitutional rights are to be promptly vindicated. *Watson v. Memphis,* 373 U.S. 526, 539, 83 S.Ct. 1314, 1321, 10 L.Ed.2d 529 (1963). Justice Goldberg's words in *Watson,* on behalf of a unanimous Court, in rejecting the defendants' desire to delay complete desegregation of public recreation facilities, are equally applicable to the case at bar:

The rights here asserted are, like all such rights, *present* rights; they are not merely hopes to some future enjoyment of some formalistic constitutional promise. The basic guarantees of our Constitution are warrants for the here and now and, unless there is an overwhelming compelling reason, they are to be promptly fulfilled.

*Id.* at 533, 83 S.Ct. at 1318 (emphasis in original).

No justification exists to postpone meaningful relief for the many thousands of Mexican-American children whose very futures in this society depend upon the effectiveness of their education. Remedying past injustices suffered by an ethnic minority may be politically inexpedient and economically burdensome; but citizens cannot be compelled to forego their constitutional rights because public officials fear public hostility or desire to save money. *Palmer v. Thompson,* 403 U.S. 217, 226, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438 (1971).

■■■ In a case such as this, where constitutional and statutory claims of a serious and extensive nature have been upheld, the court hearing those claims has no choice.

Its clear and compelling duty is to frame a decree which will work immediately to eliminate the discriminatory effects of the past and to assure future compliance with the laws of the land. *Green v. County School Board*, 391 U.S. 430, 438 n. 4, 88 S.Ct. 1689, 1694 n. 4, 20 L.Ed.2d 716 (1968); *United States v. DeSoto Parish School Board*, 574 F.2d 804, 811 (5th Cir. 1978), *cert. denied* 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978). Waiting is not the perogative of a federal court. It must act swiftly in the face of constitutional denial as it occurs. *United States v. Texas Education Agency*, 467 F.2d 848, 891 (5th Cir. 1972) (*en banc*) (Brown, C. J., separate opinion).

A. *Principles of Equitable Relief.*

 In fashioning and effectuating relief from unconstitutional *de jure* discrimination, a court must be guided by basic equitable principles. *Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (*Brown II*). Foremost among these principles is the breadth and flexibility characteristic of equity as a vehicle for ensuring an effective remedy for past wrongs. *Swann v. Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). The purpose of equitable relief is to adapt judicial power to the particular set of circumstances before the court. *Alabama v. United States*, 304 F.2d 583, 591 (5th Cir. 1963), *aff'd., mem.*, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962).

 Rather than merely prohibiting the continuation of unlawful conduct, an equitable decree may be affirmative in nature, compelling defendants to take corrective or remedial action necessary to offset the harmful effects of such conduct. *Id.* at 590; *see also United States v. Texas*, 342 F.Supp. 24 (E.D.Tex.1971), *aff'd.* 466 F.2d 518 (5th Cir. 1972) (*per curiam*) (ordering bilingual-bicultural instruction in the public schools of San Felipe Del Rio Consolidated Independent School District, to remedy *de jure* discrimination against Mexican-American students). State governments are not immune from such injunctions under the Tenth Amendment, since that general reservation of nondelegated powers to the states has no bearing upon the enforcement of express prohibitions contained in the Equal Protection Clause of the Fourteenth Amendment. *Milliken v. Bradley*, 433 U.S. 267, 291, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977) (*Milliken II*). Moreover, affirmative equitable relief may be ordered, notwithstanding a direct and substantial impact upon a state's treasury, as long as the relief is designed to operate prospectively rather than as retroactive money damages. *Id.* at 289, 97 S.Ct. at 2761; *Gary W. v. State of Louisiana*, 601 F.2d 240, 246 (5th Cir. 1979).

In order to fulfill its basic purposes, equitable relief must be carefully tailored to the violation which has been found. A court must do more than merely identify victims of unlawful discrimination and take action to assist those individuals. Instead, the remedy invoked must discretely remedy the specific consequences of the defendants' illegal actions. In instances of pervasive, systemwide discrimination, it is the combined effect of all violations which must be addressed by the remedy, even if they may have been distinct and divisible in nature. *Evans v. Buchanan*, 582 F.2d 750, 751, 764 (3rd Cir. 1978) (*en banc*), *aff'd.* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). In recapitulation, the scope of the injury determines the substance and extent of the appropriate remedy. *Swann*, 402 U.S. at 16, 91 S.Ct. at 1276.

Defendants here have conceded that their past discriminatory policies toward Mexican-Americans have contributed significantly to the learning difficulties still experienced by members of that minority group in the Texas public schools. The record summarized in Section II, *supra*, graphically demonstrates the pervasiveness of that discrimination and the severity of the language-based educational deficiencies which are its legacy. All of the circumstances which may have led to the plight of Mexican-American children in public schools throughout the state cannot be rectified here. Such relief is not only beyond the scope of this litigation, but also beyond the capabilities of the law. A duty exists, how-

ever, to address that specific cause of the current injury which stems directly from defendants' past unconstitutional conduct. Since the defendants formerly vilified the language, culture, and heritage of these children with grievous results, effectual measures must be implemented to counteract the impact of that pattern of discrimination.

In formulating an effective remedy, the hidden vestiges of discrimination, as well as its more visible symptoms, must be attacked. Courts have become increasingly sensitive to the ancillary effects of long-standing prejudice and the need to provide concomitant relief. This issue was faced squarely by the Supreme Court in *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*). In *Milliken*, the district court had ordered that remedial education programs be provided to Black students, as part of an equitable decree, grounded upon a finding of *de jure* discrimination in the Detroit public schools. Addressing the propriety of such affirmative relief, the Court noted:

> In a word, discriminatory student assignment policies can themselves manifest and breed other inequalities built into a dual system founded on racial discrimination. Federal courts need not, and cannot, close their eyes to inequalities, shown by the record, which flow from a long-standing segregated system.

*Id.* at 283, 97 S.Ct. at 2758. The Court found that the remedial programs ordered by the district court were aptly tailored to relieve the consequences of defendants' un-lawful conduct and, further, that they would serve to help restore the victims of discrimination to the position they would have enjoyed in terms of education had equal instruction been continuously provided to all children in integrated schools. *Id.* at 282–88, 97 S.Ct. at 2758–61. An affirmative response to the ancillary effects of discrimination, approved by the Supreme Court in *Milliken II*, is equally appropriate in the case at bar.[15]

### B. *The Appropriate Remedy.*

As noted in Section II, *supra*, the defendants' program to remedy the learning difficulties experienced by Mexican-American children as a result of past discrimination has been sorely deficient. Bilingual instruction has been made unavailable to tens of thousands of limited English proficiency students, at all grade levels, in need of such a learning tool. Procedures for identifying children requiring remedial assistance are unreliable. The criteria employed to transfer students out of bilingual programs serve to push many Mexican-American children into all-English classrooms long before they are able to participate effectively in such an environment. English language development programs, widely used in lieu of bilingual instruction, neglect meaningful instruction in cognitive subject areas while they are seeking to improve proficiency in English. Monitoring of remedial programs at the local level is lax, and enforcement of applicable state regulations remains virtually nonexistent.

---

**15.** Long before *Milliken*, the Court of Appeals for the Fifth Circuit had required remedial education programs as an element of equitable relief in the desegregation context to help students overcome past inadequacies in their educational opportunities. *United States v. Jefferson County Bd. of Ed.*, 372 F.2d 836, 900 (1966), *cert. denied* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). *See also United States v. Texas*, 342 F.Supp. 24 (E.D.Tex.1971), *aff'd* 466 F.2d 518 (5th Cir. 1972) (*per curiam*). These cases and others have recognized that the legacy of discrimination endures long after the schools have been desegregated, unless special remedial measures are undertaken to compensate for past inequities.

The Court of Appeals for the Third Circuit has also addressed the use of compensatory education programs to cure learning disabilities resulting in whole or in part from unlawful discrimination. *Evans v. Buchanan*, 582 F.2d 750, 767–69 (1978) (*en banc*), *aff'd.* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). Relying primarily upon *Milliken*, the court carefully reviewed and approved a wide variety of programs, including teacher training, curriculum development, remedial reading instruction, and student counseling, to eliminate the vestiges of *de jure* discrimination in the suburbs of Wilmington, Delaware. *Id.* at 769–74.

The state's response to this poor record of achievement is essentially its contention that it is doing all in its power with the resources it has available. The state's existing program, unquestionably is better than nothing. But the implementation of incomplete remedies to meet widespread constitutional violations has been consistently disapproved. Thus, for example, in *Lee v. Macon County Board of Education*, 5 Cir., 616 F.2d 805 (1980), and *Arvizu v. Waco Independent School District*, 5 Cir., 495 F.2d 499 (1974), the Court of Appeals for the Fifth Circuit rejected local desegregation plans which failed to cover all public school grades. *See also United States v. Texas Education Agency*, 564 F.2d 162, 175 (5th Cir. 1977), *cert. denied* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979) (*Austin III*).

The state's institution of a limited bilingual education program restricted to the lower primary grades is analogous to the partial desegregation plans disapproved in these and other cases. Since all Mexican-American children in Texas public schools bear the burden of historical discrimination, all in need of remedial bilingual instruction are equally entitled to receive such relief, regardless of their grade level. It is not sufficient for the state to meet the special needs of these children in lower grades and thereafter leave them to fend for themselves in all-English classrooms which these students are not prepared to enter.

In justifying their failure to provide a more extensive program of bilingual education, the defendants contend that there are simply not enough qualified bilingual teachers available to staff such a program. But they concede that the state has made inadequate efforts to train administrators in bilingual education. Pl.-Int. Ex. 409, # 821. Defendants further acknowledge that there

are presently at least 263 teachers in Texas who have bilingual certification who are not being utilized in bilingual programs, which constitutes a substantial untapped pool of talent. Pl.-Int. Ex. 409, # 501.

More importantly, the available supply of teachers trained in bilingual instruction is not static, but constantly changing. It responds to a number of variables, including the existence of recruitment programs and the strength of overall demand. Dr. Norma Hernandez, Dean of the College of Education at the University of Texas at El Paso, testified that the number of teaching students in her school who would seek bilingual training would increase substantially, if there were a firm state commitment to providing bilingual education in the Texas public schools at all grade levels. TR 617. Yet the only signals given by the state with respect to the scope of bilingual education since 1973 have been to the contrary. In 1975, required bilingual instruction was cut back from grades one through five to kindergarten through three. Bilingual exit criteria were weakened in 1979. With respect to recruitment, the Department of HEW's Office of Civil Rights found that TEA has no plan or program to recruit and hire qualified bilingual personnel. Thus, any temporary shortage of available bilingual teachers is partially of the defendants' own making.[16]

A similar objection to court-ordered bilingual instruction was raised by the defendants in *Serna v. Portales Municipal Schools*, 351 F.Supp. 1279 (D.N.M.1972), *aff'd.* 499 F.2d 1147 (10th Cir. 1974). Responding to the alleged unavailability of qualified bilingual teachers, the court noted:

> This is not an acceptable justification for not providing specialized programs where the deprivation of them violates a constitutional right . . . .

16. It should also be noted that one major reason for the present shortage of bilingual teachers is the defendants' discriminatory failure to hire Mexican-American faculty members in the past. Many school districts with large numbers of Mexican-American students refused until recently to hire any teachers with that ethnic background. For example, in 1969, the Sonora Independent School District had a Mexican-American majority in its student population, but employed no Mexican-American faculty members. Gov.Ex. C–219 at 33–34. Similarly, in 1971, the student body of La Feria Independent School District was 78.1 percent Mexican-American, but only 6.9 percent of the district's teachers shared that ethnic heritage. Gov. Ex. C–11a at 15.

*Id.* at 1283. While the defendants may have practical problems to overcome in order to provide complete and effective relief to victims of past discrimination, their duty to do so is clear and compelling.

Several other courts have faced the propriety of ordering affirmative relief in the form of bilingual instruction to remedy various constitutional and statutory violations. Cases approving such relief include *Serna v. Portales Municipal Schools*, 499 F.2d 1147 (10th Cir. 1974); *United States v. Texas*, 342 F.Supp. 24 (E.D.Tex.1971), *aff'd.* 466 F.2d 518 (5th Cir. 1972) (*per curiam*) (San Felipe Del Rio Consolidated Independent School District); and *Rios v. Read*, 480 F.Supp. 14 (E.D.N.Y.1978). Two cases, cited by defendants, disapproved bilingual plans. As already noted, in *Guadalupe Org. Inc. v. Tempe Elem. School*, 587 F.2d 1022 (9th Cir. 1978), no finding of *de jure* discrimination was made as a predicate to relief, and the plaintiffs conceded that the remedial program already in effect was sufficient to ensure effective participation by Mexican-American students in all-English classes. In contrast to the case at bar, bilingual instruction was proposed, not as a transitional tool, but as an educational objective in itself.

The other case principally relied upon by defendants, *Keyes v. School Dist. No. 1, Denver, Colo.*, 521 F.2d 465 (10th Cir. 1975), *cert. denied* 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976) did involve a constitutional violation. In disapproving the bilingual plan ordered by the district court, the Court of Appeals observed that no connection had been established at trial between the defendant school district's discriminatory practices and the harms suffered by plaintiffs. *Id.* at 482. In the instant case, defendants have stipulated to such a causal relationship and it has been here found that the current learning disabilities of Mexican-American students are, in substantial part, attributable to defendants' unlawful conduct. Moreover, the plan rejected in *Keyes* went "well beyond helping Hispanic school children to reach proficiency in English necessary to learn other basic subjects" *id.* at 482, contrary to the transmuting role con-

templated for bilingual instruction in the present case. Thus, neither *Guadalupe* nor *Keyes* stands for the proposition that bilingual education, as a general rule, is an inappropriate remedial tool. The facts of both cases render them inapplicable to the instant case.

An additional case which warrants discussion is *Morales v. Shannon*, 366 F.Supp. 813 (W.D.Tex.1973), *reversed* 516 F.2d 411 (5th Cir. 1975), *cert. denied* 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1976). The plaintiffs in *Morales* claimed that the Uvalde, Texas, school district intentionally had discriminated against Mexican-American students. As an element of relief, they sought bilingual instruction. The district court found no deliberate discrimination and held for the defendants. On appeal, the Court of Appeals for the Fifth Circuit reversed the district court on the issue of *de jure* discrimination and remanded the case for formulation of an appropriate remedy. In addressing the specific bilingual plan sought by plaintiffs, the court commented: "It strikes us that this entire question goes to a matter reserved for educators." 516 F.2d at 415.

The significance of this *dictum* in *Morales* must be assessed in light of the trial record on which the Court of Appeals based its opinion. Reviewing the testimony concerning bilingual education presented at trial, the district court noted that the witnesses offered "widely differing and conflicting viewpoints as to the efficacy of bilingual and bicultural programs in general and to the various types of programs in particular which best serve the purpose." 366 F.Supp. at 822. The district court also observed that many of the plaintiffs' witnesses concerning bilingual education were not qualified experts and merely presented "subjective, unsubstantiated opinions" concerning the efficacy of bilingual programs. *Id.* Thus, the district court concluded that this particular evidentiary record did not warrant the imposition of the specific relief requested, and the Court of Appeals agreed.

It would be erroneous to interpret *Morales* as holding that bilingual instruction must never be included as part of an equitable remedy for unconstitutional discrimination. The trial record here, in sharp contrast to that in *Morales*, contains extensive testimony by well-qualified experts, based upon testing surveys and other scientific research, concerning the substantial and unique benefits of bilingual instruction in overcoming learning problems. Far from disputing that finding, the defendants conceded the desirability of bilingual education, and defendants' own witnesses advocated broadening the scope of the state's bilingual program.

Fundamental principles of equity demand that the appropriate remedy be drawn from the specific evidence brought before the court in this particular case. The record here, unlike that in *Morales*, compels the implementation of affirmative relief designed to improve the quality and expand the scope of bilingual instruction to be provided by the Texas public schools. No other remedy can completely eradicate the effects of defendants' unlawful conduct.

■ The United States, as plaintiff, urges the court to look to the regulations promulgated by the Department of Health, Education and Welfare (now Department of Education) under Title VI in drafting an equitable decree. Specifically, the Government asserts that the so-called "Lau Remedies" document, issued by the Department of Health, Education and Welfare in 1975, be adhered to. It is true that federal departmental regulations which implement and interpret relevant statutes are entitled to great weight. *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972). But the plaintiffs in this action have not prevailed on their Title VI claims. Moreover, a congressional conference committee has recently adopted the position that the "Lau Remedies" are merely suggestions, rather than requirements which must be met by school districts. H.R.Rep.No.96–1443, 96th Cong., 2nd Sess. (1980) at 13.[17] Thus, while the "Lau Remedies" document and related Title VI regulations provide considerable guidance, they are in no way binding or dispositive in the formulation of an appropriate remedy.

■ Complete and effective relief from the constitutional and statutory violations here found must contain the following elements:

1. *Program Coverage and Content.*

Bilingual instruction must be provided to all Mexican-American children of limited English proficiency in the Texas public schools. Such a requirement should be effected in phases over a six year period, in order to ensure that adequate staffing and learning materials will be available. A suitable plan to train and recruit sufficient bilingual teachers to meet this requirement and a suggested timetable for implementation should be devised by TEA.

In accordance with the state's existing bilingual plan, school districts may join to provide bilingual programs on a more efficient and economical basis. Bilingual instruction must be provided in all subject areas, with the exception of art, music, physical education, and other subjects where language proficiency is not essential to effective participation. However, bilingual instruction shall not be provided in schools set aside solely for that purpose. To the extent possible, Mexican-American students receiving bilingual instruction must participate with students of other ethnic backgrounds in art, music, physical education, shop, home economics, and all other subjects where bilingual instruction is not

---

**17.** The Secretary of Education recently promulgated proposed regulations regarding special educational programs for students of limited English language proficiency to replace the "Lau Remedies". But Congress has enacted legislation prohibiting the expenditure of funds for the adoption or enforcement of any such final regulations prior to June 1, 1981. H.J.Res. 644, § 117 (96th Cong., 2nd Sess.).

provided, as well as at lunch, at recess, and in extra-curricular activities.[18]

### 2. Identification of Limited English Proficiency Students.

It is essential that all students be surveyed upon initially entering the Texas public schools to determine whether they have a predominant language other than English. Students whose predominant language is Spanish shall be administered tests appropriate to their age level and meeting recognized standards of reliability to ascertain whether they are sufficiently proficient in English to participate effectively in an all-English curriculum. Teacher observation, in addition to test results, should be taken into account in classifying students with respect to proficiency in English. Local identification procedures must be monitored by the TEA through on-site verification visits.

### 3. Exit Criteria.

Bilingual instruction, as a remedy to unlawful discrimination, is intended to serve as a transitional program. The Equal Educational Opportunities Act also requires that appropriate action be taken to overcome language barriers, until such time as students are able to participate equally in regular instructional programs. 20 U.S.C. § 1703(f). Accordingly, students classified as limited in English proficiency should remain enrolled in bilingual programs, until their placement in all-English classes will not produce any significant impairment of their learning abilities or achievements.

To accomplish this objective, students enrolled in bilingual programs should be tested at the end of each school year to resolve the extent to which their skills have progressed. In addition to English language test scores, a student's oral proficiency in English, mastery of specific language skills, subjective teacher evaluation, and parental viewpoint should also be taken into account. Moreover, a student's ability in Spanish must be compared with his ability in English, to find whether his transfer into an all-English classroom will handicap him educationally. Thus, a student who scores in the top quartile on a standardized achievement test administered in Spanish and in the third quartile on a similar test written in English is clearly not ready to be reclassified, even though such a student could function to some extent in an all-English classroom.

It will be necessary that specific statistical standards be prepared to implement these comprehensive exit criteria. Such standards must ensure that children of limited English proficiency receive bilingual instruction as long as necessary to fulfill their educational potential. Students in grades six through twelve who cannot meet the exit criteria should, nevertheless, be transferred out of bilingual programs at the unsolicited request of their parents. Finally, the application of exit standards must be monitored by TEA through on-site inspections.

### 4. Monitoring and Enforcement.

TEA will be required to monitor local compliance with state regulations concerning bilingual education, and also with respect to the order hereafter entered, by inspecting each school district in the state at least once every three years. Local bilingual program content, program coverage, identification procedures, and reclassification are among the areas to be examined during these periodic visits. Results of TEA monitoring should be reported to both the local school district and to the Division of Accreditation of TEA. Districts found

---

18. The purpose of the aforementioned measures is to ensure that the expansion of bilingual instruction does not serve to exacerbate existing segregation of students on ethnic grounds. It would be both inappropriate and counterproductive to separate students by ethnic background as a means of remedying past discrimination. Separation in the bilingual classes themselves is unavoidable, except to the extent that Anglo students may volunteer to participate in such classes for their own educational enrichment. But it is imperative that students be integrated, irrespective of national origin, throughout the school day, other than when bilingual instruction is in progress.

to be in serious noncompliance with state regulations or with the order to be entered in this case shall be warned and required to undertake immediate corrective action. If the violations persist, severe sanctions, including loss of accreditation and funding in appropriate instances, must be imposed.

The parties shall be ordered to meet on or before January 29, 1981, for the purpose of formulating a detailed, comprehensive plan of relief incorporating all of the elements outlined above. Such plan shall be submitted to the court by March 2, 1981. If the parties are unable to reach agreement on an appropriate remedial plan, they may submit separate proposals, in whole or in part, limited to the implementation of relief, by March 9, 1981. Following the receipt of written submissions, a final order shall be drawn up and entered. In order to ensure that school districts throughout Texas shall have sufficient time to plan appropriately for the 1981–82 school year, these deadlines must be strictly adhered to.

A plan incorporating the above elements will directly attack the remaining vestiges of *de jure* discrimination against Mexican-Americans in the Texas public schools. Students saddled with learning difficulties will be assured the special help they need to overcome those burdens and participate on an equal basis in the regular school curriculum. At the same time, the plan outlined above will remedy the defendants' statutory violations under the E.E.O.A. In providing bilingual instruction at all grade levels to Spanish-speaking students of limited English proficiency, the state education system will fulfill its duty to take "appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f). The learning process for these children will no longer be placed in abeyance until they have mastered the English language. The relief required will also satisfy the mandate of § 1703(b) of the E.E.O.A. that "affirmative steps" be taken to root out the vestiges of prior *de jure* discrimination.

The relief to be ordered in this case will not, in itself, eradicate the learning disabilities engendered in the state's Mexican-American children by many decades of injustice and neglect. As the Supreme Court observed in *Milliken II*: "[r]eading and speech deficiencies cannot be eliminated by judicial fiat; they will require time, patience, and the skill of specially trained teachers." 433 U.S. at 290, 97 S.Ct. at 2762. The tragic legacy of discrimination will not be swept away in the course of a day or a week or a single school year. But these children deserve, at the very least, an opportunity to achieve a productive and fulfilling place in American society. Unless they receive instruction in a language they can understand pending the time when they are able to make the transition to all-English classrooms, hundreds of thousands of Mexican-American children in Texas will remain educationally crippled for life, denied the equal opportunity which most Americans take for granted. These children have waited long enough to reap the benefits of an adequate education. The more quickly the ethnic injustices of the past can be overcome, the sooner this nation can face, as one People, the challenges of the future.

### ORDER

A memorandum opinion setting forth comprehensive findings of fact and conclusions of law having been filed in the above-referenced civil action on this day, an order specifying the actions to be undertaken to effectuate the general directions contained in that opinion is necessary. The considerable expertise of the parties with respect to the issues raised in this action constitutes a principal resource in the formulation of such a decree.

It is accordingly ORDERED that lead counsel for all parties in the above-referenced civil action shall meet in person on or before January 29, 1981, for the purpose of formulating a detailed, comprehensive plan of relief incorporating all of the elements outlined in the memorandum opinion. If the parties are able to agree upon a pro-

posed form of decree, their proposal shall be submitted to the court on or before March 2, 1981. In the event that the parties are unable to agree upon the terms of a proposed decree, each party shall submit a separate proposal to the court on or before March 9, 1981. All proposed forms of decree submitted shall be based solely upon the facts and conclusions contained in the memorandum opinion. The court will not entertain further evidence or argument relevant to any of the issues addressed therein.